**Rosendo CHAVEZ–RAMIREZ and Zenaida Calderon de Chavez, Petitioners,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 84–7635.

United States Court of Appeals, Ninth Circuit.

Submitted Sept. 21, 1985.*

Decided June 24, 1986.

* The panel unanimously finds this case suitable for disposition without oral argument. Fed.R. App.P. 34(a); Ninth Circuit Rule 3(f).

Susan Carrier, Sausalito, Cal., for petitioners.

Alison R. Drucker, Washington, D.C., for respondent.

Before GOODWIN, NELSON, and HALL, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Zenaida Calderon de Chavez (Chavez) and her husband, Rosendo Chavez-Ramirez, petition for review of the Board of Immigration Appeals' (BIA) decision find-

ing Chavez deportable. The BIA held that although Chavez acquired permanent resident status in 1968, she subsequently abandoned that status by living in Mexico from 1973 to 1978.[1] In reaching its conclusion the Board determined that Chavez's stay in Mexico was not sufficiently temporary to qualify as a "temporary visit abroad" and that, as a result, she failed to satisfy the requirements for a "returning resident immigrant," 8 U.S.C. §§ 1101(a)(27)(A), 1181(b).[2]

This case provides us with an opportunity to articulate a standard for determining which visits abroad are temporary and which are not.

## I

Zenaida Calderon de Chavez was born in 1941. At the age of 14, she became a nun in the religious order of Saint Bernard of San Benito. That Order brought Chavez to the United States sometime during 1966 or 1967 and assisted her in acquiring permanent resident status in 1968.

During 1973, Chavez learned that her mother had been hospitalized because of a perforated ulcer and was seriously ill. No other members of Chavez's family were able either to assist in her mother's care or to provide the financial assistance required to meet her mother's mounting medical expenses. Consequently, Chavez requested early vacation from the Order so that she could care for her mother in Mexico. The Order granted Chavez a three-month leave of absence.

Chavez's mother was released from the hospital, but she failed to recuperate fully. Chavez worked in a school kitchen during the day to earn the money required to meet her mother's medical expenses, while a neighbor cared for Chavez's mother. Chavez cared for her mother at night. After

1. Rosendo conceded deportability and, therefore, does not challenge the BIA's findings concerning his status.

2. The immigration laws provide for waiver of entry documentation for all aliens "lawfully admitted for permanent residence." 8 U.S.C.

§ 1181(b). In order for Chavez to qualify she must meet the requirements for a "returning resident immigrant" which is defined as an immigrant "lawfully admitted for permanent residence, who is returning from a temporary visit abroad." 8 U.S.C. § 1101(a)(27)(A).

three months, her mother's health had not improved, and Chavez was forced to request an additional three-month leave of absence from the Order. The Order granted the request.

After the additional three-month leave had expired, Chavez's mother was still incapable of caring for herself. Chavez's request for additional time from the Order was denied, and Chavez was forced either to resign from the Order and stay in Mexico or to leave her mother and return to the United States. Chavez resigned from the Order. Two more years passed during which time Chavez continued to care for her mother.

In January, 1976, Chavez's sister became estranged from her husband and came to live with her mother. She assumed Chavez's role in her mother's care. Shortly after her sister's return, Chavez married Rosendo Chavez-Ràmirez. In 1977, Chavez gave birth to her first child.

Chavez testified that she always intended to return to the United States, but that she and her husband could not afford to return until they actually did so in 1978. Chavez stated that she and her husband remained in Mexico after their marriage so that they might defray additional medical expenses incurred by Chavez's mother and so that they could accumulate enough money to live on while they sought employment upon returning to the United States. At no time before mid-1978, however, did Chavez ever inquire about her permanent resident status. Further, when she visited the American Consulate in 1978, she applied for a visitor's visa although she testified that she presented her green card at that time as well.

The BIA found that Chavez had abandoned her permanent resident status. In reaching its result, the Board stated:

> [w]hile we do not find it unreasonable that an alien might not immediately take up residence in the United States for economic reasons, we cannot conclude under the totality of the circumstances, that [Chavez] had an affirmative intent to move to the United States permanent-

ly at such time as her financial and familial situation permitted. We note in this regard that [Chavez] took no steps whatsoever to inquire about or to preserve her status as a lawful permanent resident subsequent to her resignation from her Order.

\* \* \* \* \* \*

> While we recognize the novel circumstances of [Chavez's] residence in the United States and the devotion of her life to her religious order, we do not find her life in the United States within religious confines indicative of a continuing desire and intent to make the United States her permanent home or one to which she would return after a temporary absence abroad.

The Board also noted that it considered Chavez's lack of property holdings, family ties, or employment in the United States as affirmative indications that Chavez harbored no intent to return to the United States. These factors coupled with the Board's conclusion that Chavez's stay in Mexico was not fixed by some early event led the Board to conclude that her visit could not be considered a "temporary visit abroad" for the purposes of 8 U.S.C. § 1101(a)(27)(A).

## II

■ While the BIA can determine that an alien is deportable only when the government has demonstrated by clear and convincing evidence that the alien has no lawful right to remain in the United States, *Woodby v. INS*, 385 U.S. 276, 285–86, 87 S.Ct. 483, 487–88, 17 L.Ed.2d 362 (1966), we must affirm the BIA's decision if it has made no error in law and if its factual findings are supported by reasonable, substantial, and probative evidence in the record considered as a whole. 8 U.S.C. § 1105a(a)(4). Thus, we cannot reverse the decision of the BIA based solely on the conclusion that a de novo review of the inert record below would lead us to an opposite result. The BIA's conclusions concerning an alien's intent are essentially factual, *see United States v. McConney*,

728 F.2d 1195, 1203 (9th Cir.) (en banc), *cert. denied,* — U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), and therefore we review them for substantial evidence. *See NLRB v. International Brotherhood of Electrical Workers, Local 340,* 780 F.2d 1489, 1492 (9th Cir.1986).

### III

Like so many cases requiring us to give context to flexible legislative guidelines, this case forces us to grapple with an inherently nebulous statutory mandate. The prior decisions construing the phrase "temporary visit abroad" are dated. While these decisions provide some collective clarification of what constitutes a "temporary visit abroad," they are perhaps most instructive as illustrations that this inquiry is intrinsically fact-specific.

*United States ex rel. Lesto v. Day,* 21 F.2d 307 (2d Cir.1927) (Swan, J.) involved an Italian immigrant who entered the United States between 1906 and 1908 and established his resident immigrant status. The record did not reflect just how long he remained in the United States, but he did serve six years in the Italian army including time in World War I. He returned after the war with his wife and daughter and remained in the United States from 1919–1921. He left for Italy again in 1921 because of his wife's illness. He returned in 1922 and stayed for a year; he then returned to Italy only to again return to the United States in 1925 to arrange for his family's return.

The court found Lesto to be deportable. In reaching this result the panel noted that a "temporary visit abroad" must mean more than a mere retention of domicile. As the Second Circuit put it:

> [w]ithout attempting a complete definition of "a temporary visit," we may say that we think the intention of the departing immigrant must be to return within a period relatively short, fixed by some early event.

*Id.* at 308–09.

In *United States ex rel. Alther v. McCandless,* 46 F.2d 288 (3d Cir.1931), Lothar Alther, a Swiss citizen, was found to be deportable. Alther attained residence status shortly after his entry into the United States in 1912. During the next five years he traveled twice to Europe, returning to the United States after each of these brief excursions. In 1918, he traveled to Switzerland and remained there for the next eight and one-half years. Before his departure, Alther had established several ties to the United States. He had registered with his local draft board; he had filed a formal declaration of his intention to become a United States citizen, and he had given a general power of attorney to someone so that his business affairs could be conducted in his absence.

At his first hearing Alther explained that he went to Switzerland so that he could get married and because his mother was in poor health. In his second hearing, however, Alther also stated that he went abroad as the representative of two American manufacturers in order to open new markets for their products. Alther's mother died only shortly after his arrival.

The Third Circuit, relying on *United States ex rel. Lesto v. Day,* found Alther deportable. The panel noted that Alther's trip abroad was not fixed by some early event. The court stated further that:

> under this rule the animus revertendi must exist as a positive element. A mere absence of intention to remain abroad permanently will not preserve the alien's nonquota status. The burden of proof is still on the government and must be met by the production of substantial evidence, but if it appears that he left with no definite intention, either of staying permanently or of returning, merely planning to let future events determine his course, his stay would not be a temporary visit. . . .

*Id.* at 290–91.

*United States ex rel. Polymeris v. Trudell,* 49 F.2d 730 (2d Cir.1931) is similar in many ways to the instant action. The relators were subjects of Greece who came to the United States in 1909. In 1923, they

returned to Greece to care for an ill member of their family. At the time of their departure, they executed an affidavit stating their intention to return to the United States within six months. After arriving in Greece, it became apparent that additional time would be required. The American counsel in Athens, however, would not grant an extension of time. The relative died in 1924.

The relators haggled with immigration authorities for the next six years, but finally arrived in the United States in 1930. Immigration authorities sought to exclude them. Judge Chase, writing for the court, with Judge Swan, author of *United States ex rel. Lesto v. Day*, on the panel found that the relators' visit abroad was temporary despite the fact that it lasted seven years. The panel stated:

> [w]hat is a temporary visit cannot be defined in terms of elapsed time alone, when it is of such duration that its temporary character may reasonably be questioned. Then the intention of the visitor, when it can be determined, will control. *United States ex rel. Lesto v. Day*, (C.C.A.) 21 F.(2d) 307, 309. Ordinarily the intention must be, as said in the above case, "to return within a period relatively short, fixed by some early event." We think the relators have brought themselves well within the claimed status as immigrants once lawfully admitted who were returning from a temporary visit abroad. They always intended to come back as soon as they could. That depended on the health of Aspasia's husband and after he died upon the time required for them to remain to attend to the settlement of his estate. *Surely this was all a matter of time which might be relatively short....*

*United States ex rel. Polymeris v. Trudell*, 49 F.2d at 732 (emphasis added).[3]

We have previously recognized the widely disparate views of what constitutes a "temporary visit abroad." *See Tejeda v. INS*, 346 F.2d 389, 393 n. 3 (9th Cir.1965). And we have cited with approval at least the portion of the Second Circuit's test in *United States ex rel. Lesto v. Day* that classifies a visit as temporary so long as it is "for a period relatively short, fixed by some early event." *See Alvarez v. District Director of United States Immigration and Naturalization Service*, 539 F.2d 1220, 1224-25 (9th Cir.1976); *Gamero v. INS*, 367 F.2d 123, 126 (9th Cir.1966). We now turn to consider the question of whether a visit can be classified as temporary when, as in *United States ex rel. Polymeris v. Trudell*, the visit is not fixed by some early event but turns on an event with a reasonable possibility of occurring within a short period of time.

We note at the outset that the Second Circuit's construction of the phrase "temporary visit abroad" does not include within it all visits abroad that are simply "not permanent," and we agree with the Second Circuit's approach. If a permanent resident left the United States on a visit that would not end for twenty years, the visit would not be permanent but it hardly could be considered temporary either. If Congress had intended to allow permanent residents to reenter the United States and retain their status after "all visits abroad that are not permanent" it could have done so. Congress chose instead to use the word "temporary," and we believe the usage contemplates a return within a relatively short period of time.

■ With this understanding, we hold that a permanent resident returns from a "temporary visit abroad" only when (a) the

---

**3.** Other cases have also found visits abroad to be temporary when the date of return was not fixed by some early event but hinged on a contingency having a reasonable possibility of occurring within a short period of time. *See, e.g., Nagano v. Brownell*, 212 F.2d 262, 264 (7th Cir.1954) (Japanese couple who travelled to Japan to arrange the marriage of their daughters returned from a temporary visit abroad). *But cf., Serpico v. Trudell*, 46 F.2d 669, 670–71 (D.Vt. 1928) (immigrant who travelled abroad at the age of 14 for the purpose of attending college and medical school and who remained abroad for ten years found to be returning from a "temporary visit abroad").

permanent resident's visit is for "a period relatively short, fixed by some early event," [4] or (b) the permanent resident's visit will terminate upon the occurrence of an event having a reasonable possibility of occurring within a relatively short period of time.[5] If as in (b), the length of the visit is contingent upon the occurrence of an event and is not fixed in time and if the event does not occur within a relatively short period of time, the visit will be considered a "temporary visit abroad" only if the alien has a continuous, uninterrupted intention to return to the United States during the entirety of his visit. Some of the factors that could be used to determine whether an alien harbored a continuous, uninterrupted intention to return in addition to the alien's testimony include the alien's family ties, property holdings, and business affiliations within the United States, the duration of the alien's residence in the United States, and the alien's family, property and business ties in the foreign country. The immigration judge and the BIA might also consider if the alien's conduct while outside of the United States constitutes an affirmative indication that he intends to remain in the foreign country. The alien, for example, might have acquired substantial or permanent ties to the foreign country after leaving the United States, or instead, the resident immigrant may have been persistent in his retaining his status by conferring with American officials during his visit.

## IV

■ With these guidelines in mind we now turn to an examination of the facts of this case in order to determine whether substantial evidence exists in the record to support the BIA's finding that Chavez's visit to Mexico was not a "temporary visit abroad."

The BIA correctly noted that Chavez's visit to Mexico was not fixed by some early event. Chavez intended to remain with her mother until she had recuperated to the point that she could provide for her own care and maintenance. The visit's duration was not fixed by a date relatively close to Chavez's date of departure nor was it fixed by an event certain to occur within a period relatively short. Chavez's visit, however, was scheduled to terminate upon the occurrence of an event having a reasonable possibility of occurring within a relatively short period of time.

Having reached this conclusion, we must determine whether the BIA's finding that Chavez did not maintain a continuous, uninterrupted intention to return to the United States is supported by substantial evidence. The BIA relied in part upon Chavez's admitted lack of family ties, property holdings, or business affiliations in the United States. The BIA noted that Chavez had no ties to the United States at all outside her religious affiliation with the Order. While we have stated that such consideration may be used as an indication of intent in appropriate cases, we find these considerations of only marginal utility here. Chavez had no property holdings because of her occupation as a nun. She attempted to retain her affiliations within the Order, seeking leaves of absence until the Order could grant no more. While the presence of family ties in Mexico supports the BIA's finding, her lack of family ties in the United States is easily explained by the fact that she was brought into this country by the Order and could not marry. While family ties may not have existed, Chavez did live in the United States for six to seven years before leaving to attend to her mother.

Thus, the BIA's decision must be affirmed, if at all, based upon its conclusion that the two and one-half years Chavez remained in Mexico after her sister began to care for her mother and after Chavez had married indicated that Chavez did not harbor a continuous, uninterrupted intention to return. While this is certainly a close case, we find that these facts provide the substantial evidence required to support the BIA's conclusion. Chavez claims

**4.** *Gamero v. INS,* 367 F.2d at 126; *United States ex rel. Lesto v. Day,* 21 F.2d at 308–09.

**5.** *See Nagano v. Brownell,* 212 F.2d 262; *United States ex rel. Polymeris v. Trudell,* 49 F.2d 730.

that she had to remain in Mexico in order to help pay for her mother's medical expenses and so that she and her husband could save enough money to return to the United States and look for employment. The BIA found her story unconvincing. Chavez stayed in Mexico for an extended period, acquired a residence in Mexico and gave birth to a child. Her testimony concerning how much money she had saved over those two and one-half years was both confused and conflicting. Until shortly before the time of her return to the United States, Chavez did not inquire about her status or attempt to take any actions to preserve it. Consequently, after examining the record as a whole, we cannot say that the BIA's conclusion that at some point during her visit Chavez abandoned her intention to return to the United States is not supported by substantial evidence.

PETITION DENIED.