976 F.2d 726
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Julita Maristanes PASCUAL, Petitioner-Appellant,
v.
William CARROLL, District Director, Immigration and
Naturalization Service, Respondent-Appellee.
 No. 91-7691.
 United States Court of Appeals,
Fourth Circuit.
 Argued: April 9, 1992
Decided: September 22, 1992
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, District Judge. (CA-91-1157-A)
 ARGUED: Michael Edward McKenzie, Arlington, Virginia, for Appellant.
 Emmett L. Fleming, Jr., Special Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 ON BRIEF: Elizabeth M. O'Brien, Camp, Barsh & Tate, Washington, D.C., for Appellant.
 Richard Cullen, United States Attorney, Renee Christina, Special Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 E.D.Va.
 Vacated and Remanded.
 Before NIEMEYER, Circuit Judge, BUTZNER, Senior Circuit Judge, and WARD, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Julita Maristanes Pascual, a native and citizen of the Philippines who was originally admitted to the United States in 1983 for permanent residence, seeks review of an order of exclusion and deportation issued against her by the Board of Immigration Appeals. The Board held that although Julita Pascual was readmitted to the United States in 1985 while in possession of a valid reentry permit, following an eighteen-month absence to care for her sick husband, she was nevertheless excludable in 1986 after returning from her second absence abroad, concluding that (1) she never established a permanent residence in the United States or (2) she abandoned her lawful permanent residence status given the cumulative effect of both absences and her conduct since her original admission in 1983. After carefully reviewing the record for substantial evidence, we conclude that the Immigration and Naturalization Service did not establish the facts supporting deportability by clear, unequivocal, and convincing evidence. See Mortazavi v. INS, 719 F.2d 86, 87 n.1 (4th Cir. 1983).
 
 
 2
 * When Julita Pascual's husband, Rodolpho Pascual, became the beneficiary of an immediate-relative visa petition in 1979, he came to the United States with an immigrant visa and petitioned to obtain spousal status for Julita Pascual. They agreed that once Julita Pascual received her visa, the Pascuals would reside "permanently" in the United States.
 
 
 3
 Julita Pascual's visa petition was approved on August 20, 1979, and she was issued an immigrant visa on July 18, 1983. At that time, however, her husband was unable to travel with her to the United States because he was suffering from Parkinson's disease and his medical treatment was considerably less expensive in the Philippines. Rodolpho Pascual suggested to Julita that she travel ahead and make a preliminary decision as to where she would like for them to settle. Entering through Los Angeles, Julita Pascual was admitted to the United States for permanent residence on September 1, 1983.
 
 
 4
 She initially spent about a month with her step-daughter in Cerritos, California, and then traveled to Alexandria, Virginia, where she stayed at the home of a friend, Norma Caramay, whom she had known for 35 years. Also during this period, Julita Pascual visited her brother in Toronto, Ontario, for approximately one week. A couple of months later she opened a bank account jointly with Caramay, into which she deposited a few hundred dollars. She also applied for a social security card and petitioned for a visa for her adopted daughter. Julita Pascual testified that she did not apply for jobs at this time because she was "still new" and did "not know the areas." She was then on leave from her employment with the Bureau of Lands, a government agency in the Philippines, where she had worked for approximately twenty-five years. She testified that when she left the Philippines, the Filipino government would not accept her retirement application but advised her to file a leave of absence and use her accrued leave time.
 
 
 5
 In early November 1983, about two months after Julita Pascual first entered the United States, Rodolpho called and told her that he was not well and that he wanted her to return. Before leaving the United States, Julita Pascual obtained a reentry permit from the Immigration Service on November 7, 1983, giving as one of her reasons for wishing to travel abroad, "to take care of my ailing husband." She departed from the United States about a week later. When Julita Pascual returned to the Philippines to care for her husband, she resumed part-time employment with the Filipino Bureau of Lands.
 
 
 6
 Julita Pascual returned to the United States in October 1985, when, as she contends, her husband's condition had improved and during the validity of her reentry permit. Upon her reentry, she returned to Alexandria and again stayed with her friend, Caramay. Although Pascual again continued on leave from her job with the Filipino government, she found employment in the United States, working at Bradley's Stop & Shop for two weeks and at Marshall's for three or four days, until she received word that her husband had died. On November 21, 1985, Julita Pascual returned to the Philippines to handle matters concerning her late husband's estate.
 
 
 7
 Julita Pascual returned for the last time to the United States on November 20, 1986, during the period of validity of her Alien Registration Receipt Card ("green card") as a travel document, seeking readmission as a returning resident. She was detained by the border authorities due to an incorrect notation on her alien registration receipt card, a mistake admitted to by the Immigration Service at the exclusion hearing. At this time, she was paroled into the United States, pursuant to § 1182(d)(5)(A), pending the outcome of an inquiry by the Immigration Service. On May 6, 1987, the Immigration Service instituted exclusion proceedings against Julita Pascual, contending that she had abandoned her residence in the United States and was therefore not entitled to returning resident status. Following a hearing, the immigration judge determined that despite Julita Pascual's presentment of a valid reentry permit, she abandoned her lawful permanent residence status during her absence between November 1983 and October 1985 because the absence could not be considered a "temporary visit abroad," as required underss 1181(b) and 1101(a)(27)(A), and, therefore, she was properly excluded from readmission to the United States in 1986. The Board of Immigration Appeals affirmed, holding that under §§ 1181(b) and 1101(a)(27)(A) Julita Pascual never established permanent residence and that she had abandoned her lawful permanent residence status as a result of her conduct, including two lengthy trips to the Philippines, since her admission in 1983. On July 11, 1991, Julita Pascual was ordered excluded and deported from the United States. She then filed a petition for habeas corpus, pursuant to 8 U.S.C. § 1105a(b) and 28 U.S.C. § 2241(a), which was denied by the district court. This appeal followed.
 
 II
 
 8
 The admission of immigrants into the United States is governed by 8 U.S.C. § 1181, which generally requires that the immigrant present a valid unexpired immigrant visa and a valid unexpired passport or other suitable travel document. See 8 U.S.C.s 1181(a). In lieu of an immigrant visa, a returning immigrant may be readmitted if she or he presents a valid reentry permit, issued in accordance with 8 U.S.C. § 1203 or qualifies as a "returning resident immigrant" under 8 U.S.C. §§ 1181(b) and 1101(a)(27)(A). See also 8 U.S.C. § 1182(a)(7) (Unless otherwise provided, any immigrant shall be excluded from admission to the United States who, at the time of application for admission, "is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identification and nationality" if required by regulation).
 
 
 9
 Julita Pascual contends that at the time of her original admission in September 1983, she was accorded permanent resident status and that her departure in November 1983 and reentry in October 1985 were governed by a properly issued reentry permit. She also contends that her reentry from her second departure was authorized by the presentation of a "green card," established by regulation as a valid travel document. She argues that her two trips to return to the Philippines, one to attend her husband's illness and the second his death, were temporary in nature and did not reveal any intent to abandon her lawful permanent residence status. The INS contends and the Board concluded that she never established a lawful permanent residence status and in any event abandoned it by her long absences from the United States, short stays in the United States, and financial ties to the Philippines.
 
 
 10
 We review de novo the district court's denial of a petition for habeas corpus. See Desir v. Ilchert, 840 F.2d 723, 726 (9th Cir. 1988). The factual findings underlying the Board's order of deportation are to be sustained if supported by reasonable, substantial, and probative evidence on the record considered as a whole. See id.; Mortazavi v. INS, 719 F.2d 86, 87 (4th Cir. 1983) (quoting 8 U.S.C. § 1105(a)(4)). This standard of review, however, is distinguishable from the burden of proof placed on the administrative agency itself, which must establish the facts supporting deportability by clear, unequivocal, and convincing evidence. Id. at 87 n.1; see also 8 C.F.R. § 242.14(a) ("A determination of deportability shall not be valid unless it is found by clear, unequivocal and convincing evidence that the facts alleged as grounds for deportation are true.").
 
 
 11
 When Julita Pascual entered the United States in 1983, she did so under a plan made with her husband to establish permanent residence in the United States. She brought her belongings, including all of her jewelry,[1] her clothes, and approximately one-half of the cash from her marital estate. During her initial two and a half month stay, she opened a bank account, applied for a social security card, and petitioned for a visa on behalf of her adopted daughter. And, before returning to the Philippines to care for her husband, she arranged to leave her possessions in the United States and obtained a reentry permit. It is not seriously disputed that she acquired lawful permanent residence status when she was admitted in these circumstances with a visa for that purpose.
 
 
 12
 It does not appear that Julita Pascual lost this status with her first return to the Philippines. When she was readmitted to the United States in 1985, she presented a valid unexpired reentry permit that she had obtained in 1983, in lieu of an immigrant visa, and a valid passport. Section 1203(a) states that any alien lawfully admitted for permanent residence who intends to depart temporarily from the United States may apply for a permit to reenter the United States. The reentry permit "shall be accepted in lieu of any visa which otherwise would be required" under the immigration laws and " shall [have no other effect] except to show that the alien to whom it was issued is returning from a temporary visit abroad." See 8 U.S.C. § 1203(e) (emphasis added). In light of this clear statutory direction, the INS bears a heavy burden of establishing by clear, unequivocal, and convincing evidence that an applicant who presents a valid unexpired reentry permit is nevertheless excludable under § 1182(a)(7) (governing documentation requirements).
 
 
 13
 The act of the Attorney General in approving Julita Pascual's reentry permit was an official act that is presumed to have been done lawfully until the contrary is made to appear. See United States ex. rel. Iodice v. Wixon, 56 F.2d 824, 825 (2d Cir. 1932). In order to issue the permit, the Attorney General had to find that Julita Pascual was lawfully admitted for permanent residence, that she completed the application in good faith, and that her proposed departure would not be contrary to the interests of the United States. See 8 U.S.C. § 1203(b). Because we presume that the application was completed in good faith, we must also presume that Julita Pascual intended only "to depart temporarily from the United States." See 8 U.S.C. § 1203(a). In fact, the statute expressly sanctions this presumption. See 8 U.S.C. § 1203(e). Therefore, while we recognize that in an appropriate case the circumstances may justify exclusion under § 1182(a)(7) despite the alien's presentment of a valid reentry permit, we conclude that in this case the INS failed to meet that burden and, consequently, that Julita Pascual's absence in 1983 through 1985 did not constitute an abandonment of her lawful permanent residence status.[2]
 
 
 14
 When Julita Pascual sought readmission to the United States in 1986 from her second visit to the Philippines, she presented a valid Alien Registration Receipt Card and a valid passport. While the Immigration Act does not specifically authorize the use of an Alien Registration Receipt Card as an admission document,s 1181(b) provides that
 
 
 15
 [n]othwithstanding the provisions of section 1182(a)(7)(A) of this title in such cases or in such classes of cases and under such conditions as may be by regulations prescribed, returning resident immigrants, defined in section 1101(a)(27)(A) of this title, who are otherwise admissible may be readmitted to the United States by the Attorney General in his discretion without being required to obtain a passport, immigrant visa, reentry permit or other documentation.
 
 
 16
 8 U.S.C. § 1181(b). A "returning resident immigrant" refers to "an immigrant, lawfully admitted for permanent residence, who is returning from a temporary visit abroad." See 8 U.S.C. § 1101(a)(27)(A). Pursuant to this grant of discretion, the Attorney General has declared that an "Alien Registration Receipt Card may be presented in lieu of an immigrant visa by an immigrant alien who is returning to an unrelinquished lawful permanent residence in the United States ... after a temporary absence abroad not exceeding one year." 8 C.F.R. § 211.1(b). In this case, then, we must determine whether Julita Pascual met the requirements of 8 U.S.C. § 1181(b) and 8 C.F.R. § 211.1(b) when she returned to the United States in 1986.
 
 
 17
 The term "lawfully admitted for permanent residence" means "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20). In Saxbe v. Bustos, 419 U.S. 65, 71 (1974), the Court held that an immigrant is not required to maintain a permanent residence in the United States in order to acquire permanent residence status. Rather, this status is acquired when the alien satisfies: (1) any numerical limitations on the entry of immigrants, see 8 U.S.C. § 1151; (2) requirements as to qualitative matters such as health, morals, and economic status, see 8 U.S.C. § 1182; and (3) the need for an immigrant visa, see 8 U.S.C. 1181(a). See Bustos, 419 U.S. at 72.
 
 
 18
 While it appears that Julita Pascual acquired lawful permanent residence status when she first entered the United States in 1983, the more difficult question remains whether, when she sought readmission to this country in 1986, she was returning to "an unrelinquished lawful permanent residence ... after a temporary absence abroad," as required by 8 C.F.R. § 211.1(b).
 
 
 19
 The term "unrelinquished lawful permanent residence" is not defined in either the regulations or the Immigration and Nationality Act. While the Act defines "residence" as the alien's "principal, actual dwelling place in fact, without regard to intent," see 8 U.S.C. § 1101(33), it is unclear whether 8 C.F.R.s 211.1(b) incorporates this definition rather than the status requirement ofs 1181(b), the statutory provision from which the regulation derives its authority. See Ching-Chung Yu, et al., Aei-ybb-nwp (BIA November 19, 1991) (determining that the concept of establishing residency, with respect to 8 C.F.R. § 211.1(b), "is intrinsically bound up with the concept of being accorded lawful permanent residence status"); Matter of Kane, 15 I & N Dec. 258, Int. Dec. # 2371 (BIA 1975) (concluding that " 'unrelinquished lawful permanent residence, as used in 8 CFR 211.1(b), can have reference to something less than a permanent dwelling place in the United States"). In any event, for the reasons stated above in connection with her obtaining permanent residence status in the first place, we conclude that the INS failed to establish the facts giving rise to the determination that Julita Pascual failed to establish residency in the United States by clear, unequivocal, and convincing evidence.
 
 
 20
 The INS also argues, and the Board found, that Julita Pascual abandoned her residency status, pointing to the facts that she took two relatively lengthy trips to the Philippines, had family and financial ties to the Philippines, and did not resign from her job when she came to the United States in 1983. It is also argued, for these same reasons, that Julita Pascual was not returning from a temporary visit abroad.
 
 
 21
 To address the effect of Julita Pascual's first absence on the INS's claim of abandonment, we must examine the law regarding reentry permits. The Immigration and Nationality Act provides that any alien lawfully admitted for permanent residence who "intends to depart temporarily from the United States" may apply for a reentry permit. 8 U.S.C. § 1203(a). If the Attorney General finds that the applicant has been lawfully admitted to the United States for permanent residence, that the application was made in good faith, and that the applicant's proposed departure would not be contrary to the interests of the United States, the Attorney General may, in her or his discretion, issue the reentry permit. 8 U.S.C. § 1203(b). The reentry permit shall be valid for not more than two years from the date of its issuance, and it shall be accepted in lieu of the immigrant visa otherwise required under § 1181(a). See 8 U.S.C. § 1203(b),(e); see also 8 C.F.R. § 211.1(b)(2),(3) (Any "immigrant returning to an unrelinquished lawful permanent residence in the United States after a temporary absence abroad may present a valid unexpired reentry permit" in lieu of an immigrant visa, or if upon showing good cause for the failure to present a visa or reentry permit, may have the requirement waived by the government). Apart from its validity as an admission document, the reentry permit "shall have no effect under the immigration laws except to show that the alien to whom it was issued is returning from a temporary visit abroad." 8 U.S.C. § 1203(e). Accordingly, we conclude the first trip did not demonstrate abandonment of a permanent residence status.
 
 
 22
 As a final matter, we must review whether Julita Pascual's second trip to the Philippines constituted abandonment of her lawful permanent residence status. In general, a permanent resident returns from a "temporary visit abroad" when the visit is for" 'a period relatively short, fixed by some early event,' " or "will terminate upon the occurrence of an event having a reasonable possibility of occurring within a relatively short period of time." See Chaves-Ramirez v. INS, 792 F.2d 932, 936-37 (9th Cir. 1986). Julita Pascual testified that her trip to the Philippines in 1985 through 1986 was for the purpose of administering her late husband's estate, a point with which the INS agreed at oral argument. Therefore, because this absence was one that would "terminate upon the occurrence of an event having a reasonable possibility of occurring within a reasonably short period of time," we conclude that the Board's determination that the absence was not a temporary visit abroad is not supported by substantial evidence. For the same reason, we also conclude that this absence did not constitute abandonment of Julita Pascual's lawful permanent residence status. While it is true that Julita Pascual still retains some ties with the Philippines, we do not agree that they are sufficient to warrant her exclusion from the United States once she obtained permanent residence status.
 
 
 23
 Accordingly, the order of the district court denying habeas corpus relief is vacated and the case remanded for further proceedings consistent with this opinion.
 
 VACATED AND REMANDED
 WARD, Senior District Judge, dissenting:
 
 24
 I am in complete accord with the majority's holding that appellant Pascual established permanent resident status in 1983. However, I believe that this Court cannot reverse the decision of the lower court "solely on the conclusion that a de novo review of the inert record below would lead us to an opposite result." Chavez-Ramirez v. Immigration & Naturalization Service, 792 F.2d 932, 934 (9th Cir. 1986). Therefore, I would affirm the district court's finding that appellant failed to maintain her permanent resident status upon her departure from and return to the United States between 1983 and 1985.
 
 
 25
 The majority maintains that, because the Attorney General issued appellant Pascual a reentry permit in October 1983 which was valid until October 1985, we are precluded from holding that appellant abandoned her permanent resident status during that time. However, such an act by the Attorney General merely represents prima facie evidence of permanent resident status. Zacharias v. McGrath, 105 F.Supp. 421, 426 (D.C. Dist. Col. 1952) (citing Hamburg-American Line v. United States, 291 U.S. 420 (1934)). It does not amount to conclusive evidence such that appellant's permanent resident status is immune from attack. I believe that the majority ignores what amounts to reasonable, substantial, and probative evidence by which the ALJ and Board of Immigration Appeals found that the INS had overcome its burden of proof in establishing that appellant Pascual abandoned her permanent resident status. Such being the case, I consider appellant Pascual properly excludable under 8 U.S.C.s 1182(a)(7) (1988).
 
 
 26
 Specifically, the majority does not address the fact that between October 1983 and October 1985, appellant remained in the United States for less than three months, that appellant kept her permanent residence in Manila, kept her position with the Philippines Bureau of Lands, and voted and paid taxes in the Philippines. (J.A. 17-71). Additionally, among appellant's stated reasons for returning to the Philippines was to dispose of her property and return to the United States with the proceeds, neither of which has occurred. (J.A. 5, 132). Such evidence, I believe, prevents this Court from overturning the lower court's determination as unsupported by reasonable, substantial, and probative evidence when the record is considered as a whole.
 
 
 27
 I also disagree with the majority's characterization of appellant's November 1983 through October 1985 absence from the United States as a "temporary visit abroad." Under 8 U.S.C. § 1101(a)(27)(A) (1988), a permanent resident returns from a "temporary visit abroad" only when: (1) the visit is for "a period relatively short, fixed by some early event," or (2) the visit will terminate upon the occurrence of an event having a reasonable possibility of occurring within a relatively short period of time. Chavez-Ramirez, supra, 792 F.2d at 936-37.
 
 
 28
 Appellant's 1983 through 1985 trip does not meet either criteria set forth in Chavez-Ramirez. The trip was for two years, not a relatively short period of time, and its length was not fixed in time by any event, except possibly by the expiration date on appellant's reentry permit. Appellant testified that she was to come back to the United States when her husband was well enough to travel, but she also admitted to knowing that such a recovery was unlikely due to the nature of his illness. (J.A. 101-02). Given such evidence, it is illogical to find that appellant believed such an event had a reasonable likelihood of occurring within a relatively short period of time.
 
 
 29
 I have a great deal of sympathy for appellant's unfortunate situation. However, in reversing the lower court, I believe the majority has ignored what amounts to reasonable, substantial, and probative evidence which underlies the lower court's determination that the INS overcame its burden of proof in establishing that appellant voluntarily abandoned her permanent resident status during her absence from the United States in 1983 through 1985. On this basis, I would affirm the lower court and must, therefore, respectfully dissent.
 
 
 
 [1]
 Julita Pascual testified that she sold some of her jewelry because she needed cash and that she brought the rest of it with her to the United States
 
 
 [2]
 Although the INS now raises the generalized contention that the reentry permit was procured through fraud, it did not raise this claim below and neither the immigration judge nor the Board made any such finding