# United States Court of Appeals
## For the First Circuit

No. 19-1777

WISSAM MAHMOUD,

Petitioner,

v.

WILLIAM P. BARR, ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Thompson, and Kayatta,
<u>Circuit Judges</u>.

Randy Olen for petitioner.
Victoria M. Braga, Trial Attorney, Office of Immigration
Litigation, with whom Joseph H. Hunt, Assistant Attorney General,
Civil Division, and Cindy S. Ferrier, Assistant Director, Office
of Immigration Litigation, were on brief for respondent.

November 30, 2020

**THOMPSON**, **Circuit Judge**.    Petitioner Wissam Mahmoud seeks our intervention in a decision of the Board of Immigration Appeals (BIA) dismissing his appeal of an Immigration Judge's (IJ) decision finding that Mahmoud had abandoned his status as a Lawful Permanent Resident (LPR) in the United States and ordering removal. Bound by a deferential standard of review, we must deny Mahmoud's petition.

## BACKGROUND

### Mahmoud's Story

Mahmoud is a Lebanese citizen, admitted to the United States as an LPR in 1991.  By 2002, Mahmoud's parents and siblings had all lawfully immigrated to the United States, with the bulk of them settling in Rhode Island.  From 1991 to 2008, Mahmoud lived with his family in what might be appropriately described as the family compound.  Consequently, Mahmoud never owned his own home in Rhode Island.  During this seventeen-year period, he did pay taxes to the United States and had health insurance here.

In 2008, in the midst of a United States recession, Mahmoud, having lost his job managing one brother's restaurant, obtained a temporary work visa and moved to Edmonton, Alberta, Canada, to work in a restaurant owned by another one of his brothers.  While there, he solely paid taxes to Canada and had Canadian health insurance.

Mahmoud renewed his Canadian temporary work visa annually because he says he was unable to find work in the United States and, in 2012, he purchased a home in Canada. In April of 2013, Mahmoud was visiting the United States when a United States Customs and Border Patrol Officer advised him that he should apply for a reentry permit for travel to the United States.

Along the way, Mahmoud met a Canadian citizen of Lebanese descent who would become his wife. The couple travelled to Lebanon in 2013 where they married in August. While Mahmoud was there, a United States Customs and Border Patrol Officer again advised Mahmoud that he should obtain a reentry permit.

After the wedding, the couple flew back to Canada with the professed intention of settling their affairs and returning to the United States. Towards that end (and as before), Mahmoud's wife never petitioned Canada on Mahmoud's behalf for any sort of permanent immigration status. But before Mahmoud could order his affairs, he fell ill with listeria and viral meningitis and required months of hospitalization and rehabilitation in Canada from October of 2013 through most of 2014. The rehabilitation program prohibited Mahmoud from traveling, but once he was well enough to adequately move about, he says he intended to return to the United States. In July of 2014, Mahmoud's wife gave birth to their son, whose birth was registered in Canada and not in the United States.

By November of 2014, Mahmoud was physically able to travel and applied for preclearance to enter the United States. He was paroled into the United States in December of 2014 for a deferred inspection because the duration of Mahmoud's absence from the United States at that point raised red flags about his admissibility. In total, from 2008 to 2014, Mahmoud returned to the United States seven to ten times to visit family and look for a job. The visits, ranging in length from three days to several weeks, cumulated in Mahmoud being physically present in the United States for 110 days over that six-year period.

At the hearing before the IJ, the government contended that Mahmoud was not admissible into the United States because he had abandoned his LPR status. In support of its position, the government highlighted Mahmoud's connections to Canada and the short time he spent in the United States. For his part, Mahmoud testified to the facts as summarized above and repeatedly stated that he always intended to return to the United States. In its ruling, the IJ concluded that Mahmoud's actions did not demonstrate an uninterrupted intent to return to and permanently reside in the United States. Specifically, the IJ held that Mahmoud's extended trips out of the country, various connections to Canada, and delay in pursuing a reentry permit (even after being warned in April and August of 2013 to do so) all evinced that Mahmoud lacked the intent to return to the United States as soon as practicable. As to

- 4 -

Mahmoud's main contention that he was looking for work in the United States during his travels, the IJ found that Mahmoud's trips were often too short to facilitate a search for work.

On appeal to the BIA, the Board agreed with the IJ that Mahmoud did not demonstrate a continuous, uninterrupted intent to return to the country and dismissed the appeal. The BIA noted that Mahmoud's record demonstrated a close connection to Canada (which he had maintained for five years when he became too ill to travel) and that his trips to the United States were too short to allow for a reasonable search for employment.

Mahmoud now petitions us for relief. He argues that he always wanted to move back to the United States once he had a job and the burden is on the government to disprove that. Carefully considering his argument, the record, and the decision of the BIA, we deny Mahmoud's petition.

**OUR TAKE**

**Standard of Review**

When an applicant for admission has a colorable claim to returning to lawful permanent resident status, the government bears the burden of proving by "clear, unequivocal, and convincing evidence" that he abandoned his status while out of the country and is therefore ineligible for admission into the United States. Katebi v. Ashcroft, 396 F.3d 463, 466 (1st Cir. 2005) (quoting Singh v. Reno, 113 F.3d 1512, 1514 (9th Cir. 1997)). Where "the

- 5 -

BIA adopted and affirmed the IJ's decision yet supplied its own gloss, we review the tiered decisions as a unit." Arias-Minaya v. Holder, 779 F.3d 49, 52 (1st Cir. 2015). We review the fact-intensive question of whether the government proved by clear, unequivocal, and convincing evidence that an LPR abandoned his status under the "substantial evidence test." Katebi, 396 F.3d at 466. "Substantial evidence exists if the [BIA's] decision is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Id. (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). To grant Mahmoud's petition, the evidence must not only support the contrary finding, but compel it. See Albathani v. INS, 318 F.3d 365, 372 (1st Cir. 2003).

### Retention or Abandonment of LPR Status

In most circumstances, an LPR is permitted to reenter the United States after traveling abroad, so long as he is "returning to an unrelinquished lawful permanent residence after a temporary visit abroad." Katebi, 396 F.3d at 466 (quoting Moin v. Ashcroft, 335 F.3d 415, 418 (5th Cir. 2003)). If, however, the trip in question was not a "temporary visit abroad," then the LPR will be deemed to have abandoned his permanent resident status. Id. Although the notion of a "temporary visit abroad" is "inherently nebulous," id. (quoting Aleem v. Perryman, 114 F.3d 672, 676 (7th Cir. 1997)), we have identified two main

circumstances in which a trip abroad qualifies as a temporary visit:

> [A] permanent resident returns from a temporary visit abroad only when (a) the permanent resident's visit is for a period relatively short, fixed by some early event, or (b) the permanent resident's visit will terminate upon the occurrence of an event having a reasonable possibility of occurring within a short period of time. If as in (b), the length of the visit is contingent upon the occurrence of an event and is not fixed in time and if the event does not occur within a relatively short period of time, the visit will be considered a temporary visit abroad only if the alien has a continuous, uninterrupted intention to return to the United States during the entirety of the visit.

Id. (quoting Chavez-Ramirez v. INS, 792 F.2d 932, 936-37 (9th Cir. 1986)). Mahmoud agrees that his time abroad was not "relatively short" and that his case is therefore best analyzed under part (b). The operative question then is whether the BIA erred when it held he did not have "a continuous, uninterrupted intention to return to the United States during the entirety of his visit" to Canada. Id.

Merely professing one's intent to maintain LPR status is not alone enough. Id. at 467. Indeed, intent can be a slippery concept, so we evaluate Mahmoud's actions to see if they evince his continued intent to return to the United States. Though time abroad can be an informative factor, it is not alone determinative in this holistic analysis. We look at the record to determine if

Mahmoud's "activities are consistent with an intent to return to the United States as soon as practicable." Id. at 466. Specifically, we look at Mahmoud's "family ties, property holdings, and business affiliations within the United States" and in Canada, where he was living during his time abroad. Id. at 466-67 (citing Moin, 335 F.3d at 419).

Mahmoud undoubtedly had strong family connections in the United States through the entirety of his time abroad. His parents and several siblings lived in Rhode Island and he stayed with them during his visits to the United States. Though Mahmoud also had a brother in Canada with whom he lived for some time and he eventually married a Canadian citizen, that alone does not minimize his familial connections to the United States. However, Mahmoud's other actions as reasonably interpreted by the government weaken his contention that he maintained a continual intention to return to the United States as soon as practicable. See Singh, 115 F.3d at 1514. He purchased a home in Canada, paid taxes there, maintained employment there, married a Canadian citizen. During that same period (2008 - 2014), Mahmoud only spent 110 days total in the United States, and did not pay taxes, have employment, or own any property in this country. Considering that, we can see why the BIA did not believe he had a continual intent to make a hasty return to the United States. See Matter of Huang, 19 I. & N. Dec. 749, 755-56 (BIA 1988) (holding government met its burden

- 8 -

of proving LPR relinquished status where she did not maintain a residence or have a job in the United States and stayed with relatives when visiting occasionally). Further, even prior to his illness, he delayed applying for reentry to the United States, despite multiple suggestions to do so from immigration officers.

The sticking point of all of this, which was highlighted at oral argument, is Mahmoud's contention on appeal that he planned to return to the United States as soon as he obtained employment. But the only evidence in the record supporting this contention is Mahmoud's own conclusory testimony that he "look[ed] for work" each time he returned to the United States. Mahmoud did not present evidence of any specific efforts he made to find a job, nor is it obvious why an experienced restaurant worker could not find a job working in a restaurant in the United States for over five years. Mahmoud argues though that the burden below is on the government, so he has no obligation to introduce such evidence. Mahmoud is not wrong about the burden, but his argument stalls when one realizes that the government introduced evidence of Mahmoud's extensive connections to Canada. The government met its burden with the weight of that evidence, so it need not disprove Mahmoud's unsupported contention that he wanted a job in the United States.[1] See Katebi, 396 F.3d at 466-67.

_____

[1] It is worth noting that Mahmoud's own communal or cultural notions regarding family may well be working to his disadvantage here. He

- 9 -

Mahmoud makes two more arguments on appeal that require attention. First, he points out that since returning to the United States in 2014, he has put his house in Canada on the market, has taken a job working for one of his brothers in the United States, and has petitioned for his wife and their child to join here. None of this undermines the conclusion that Mahmoud abandoned his lawful permanent resident status during his many years of living and working in Canada. Second, Mahmoud argues that the BIA made a factual error when it noted that Mahmoud did not move back to the United States promptly after his brother opened a restaurant here. Mahmoud contends that his brother did not open that restaurant until Mahmoud was in the hospital in 2013, so he did indeed move as soon as practicable back to the United States to work here. The transcript excerpts upon which Mahmoud relies reveal some confusion, apparently brought about by the government's vague questioning, about which of Mahmoud's brothers is being discussed. Neither the IJ's or BIA's decisions rely upon this allegedly

only resided with family in the United States and never acquired title to his own home here. Our case law conflates reliance on family for housing with a lack of permanence and does not reward those who stay with their families. See Singh, 113 F.3d at 1515-16 (collecting and relying upon cases where LPR lost status after only staying with family during trips into the United States). This is not to say that a different level of cultural understanding would make a difference in Mahmoud's case (or many others), but this limited convention of understanding intent certainly establishes a deep hole for Mahmoud (and others who rely on family for housing in the United States) to climb out of.

erroneous fact to any meaningful degree and, on the whole, the decisions are supported by the record evidence. <u>See</u> <u>Elias-Zacarias</u>, 502 U.S. at 481 n.1 ("To reverse the BIA finding we must find that the evidence not only <u>supports</u> that conclusion, but <u>compels</u> it.").

## CONCLUSION

For the foregoing reasons, the petition is **<u>denied</u>**.