Eshghan KHODAGHOLIAN, Petitioner,

v.

John ASHCROFT, Attorney
General, Respondent.

No. 02–71317.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 14, 2003.

Filed July 14, 2003.

Susan E. Hill, Law Offices of Susan E. Hill, Los Angeles, CA, for the petitioner.

Michael T. Dougherty, Trial Attorney, Office of Immigration Litigation, United States Department of Justice, Washington, DC, for the respondent.

Before TASHIMA, BERZON, and CLIFTON, Circuit Judges.

## OPINION

CLIFTON, Circuit Judge.

A non-citizen who has obtained the status of a lawful permanent resident—commonly described as someone who has a "green card"—may lose that valuable status, and the right to remain in this country, if he or she is determined to have abandoned that status. That is the prospect facing Eshghan Khodagholian, a native and citizen of Iran. He petitions for review of a decision by the Board of Immigration Appeals ("BIA") affirming a determination by an immigration judge ("IJ") that he was subject to removal because he had abandoned his status as a lawful permanent resident ("LPR") of the United States. Because we conclude that the government has failed to prove by clear, unequivocal, and convincing evidence that Khodagholian has given up his status as a permanent resident, we grant the petition and vacate the order of removal.

## I. BACKGROUND

Khodagholian was admitted to the United States as an LPR on July 5, 1993, when he was 41 years old. He arrived with his wife and their two children, who were also admitted as lawful permanent residents.

Khodagholian admitted that when he and his family first came to the United States, he was not sure whether they would stay, in light of all the uncertainties associated with such a move. Thus, Khodagholian and his family moved cautiously.

They brought $14,000 with them, but did not sell off everything they owned in Iran.

In the five years in the United States from July 1993 to September 1998, excluding the periods he was in Iran, Khodagholian and his family lived in the Los Angeles area. He worked sporadically doing electrical work, telemarketing, and painting. It is not clear how often he worked or how much he was paid, but it appears from the record that he worked intermittently at best. Khodagholian's wife was employed during much of that time, apparently until approximately one month prior to the hearing before the IJ. Their son attended high school in this country from 1993 to 1997 and college starting in 1997. Their daughter attended school here as well, at least from 1996.

The challenge to Khodagholian's status is based primarily upon three trips he made to Iran during the five years and two months between the time he and his family arrived in July 1993 and his return from his third trip in September 1998. *First*, in September 1993, he left for roughly four months. The purpose of the trip was to sell some items and gather documents needed for the children's schools and other purposes in the United States. His wife and children went with him to Iran, but they returned to California after two months. He stayed on in Iran alone for the last two months. *Second*, in 1995, Khodagholian went to Iran by himself for five to six months to care for his dying mother and his recently orphaned nephews. *Third*, Khodagholian was gone from June 1997 to September 1998, or roughly 15 months. That trip was made alone, while his wife and children remained in the United States. The stated purpose was to sell the family's house in Iran. When Khodagholian arrived in Iran,[1] he was stopped by the police at the airport and notified of a tax bill from a partnership he had sold before coming to the United States.[2] He was told that he was barred from leaving Iran until the taxes were paid. The IJ found that, due to that unexpected development, Khodagholian was stuck in Iran until April 27, 1998, when the Iranian government cleared him to go. Khodagholian did not return to the United States immediately after that, however, a fact that the IJ concluded to be significant, as will be noted below. Khodagholian argued that he had borrowed the money to pay the tax bill, and had to stay on in order to pay back that debt.

Upon re-entry into the United States on or around September 4, 1998, Khodagholian was stopped when attempting to enter using his green card (INS From I–551). After an interview, the INS suspected that he did not qualify as a "returning resident," because he had overrun the one-year regulatory limit on re-entering without needing a re-entry permit. He was issued a Notice to Appear, which charged him as an inadmissible alien under INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), "who at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border identification crossing card, or other valid entry document required by the [INA]."

---

**1.** It is not clear from the record whether Khodagholian was notified of the tax debt when he arrived in June 1997, or when he tried to leave Iran in October 1997. We rely on his statement that he was pulled aside by police and notified when he arrived as opposed to other statements that he was notified when he tried to leave in October 1997. The difference is immaterial to the outcome.

**2.** Khodagholian alleged that his former partner was supposed to have paid those taxes, but he was apparently unsuccessful in so persuading the Iranian tax authorities.

On October 30, 2000, after a hearing, the IJ found that Khodagholian had abandoned his lawful permanent residence and was subject to removal. It was the extended third absence which formed the main argument against Khodagholian. Most of that absence could fairly be described as involuntary, and it appears the IJ so found. The IJ acknowledged the authenticity of the document Khodagholian introduced showing that he was not cleared to leave the country until April 27, 1998, 11 months into his 15 month trip. The IJ took issue with the subsequent four months during which Khodagholian remained in Iran, however, ultimately concluding that the cumulative impact of the evidence showed lack of an intent on the part of Khodagholian to reside permanently in the United States.

Khodagholian appealed to the BIA. On April 22, 2002, the BIA affirmed the IJ in a summary opinion, adopting the IJ's factual findings. This petition followed.

## II. DISCUSSION

■ Since the Board adopted the IJ's findings, it is the IJ's decision that we review. *Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir.2002). In doing so, we apply a deferential standard of review. Whether Khodagholian abandoned his LPR is an intrinsically fact-specific question and is therefore reviewed under the substantial evidence standard. *Chavez–Ramirez v. INS*, 792 F.2d 932, 934–35 (9th Cir.1986) (citations omitted). "To reverse under the substantial evidence standard, the evidence must be so compelling that no reasonable factfinder could fail to find the facts were as the alien alleged." *Singh v. Reno*, 113 F.3d 1512, 1514 (9th Cir.1997) (citing *INS v. Elias–Zacarias*, 502 U.S. 478, 483, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)).

■ Though the standard of review is deferential and works against Khodagholian here, the underlying burden of proof cuts very much the other way. "When an applicant has a colorable claim to returning resident status, as [Khodagholian] does, the INS has the burden of proving he is not eligible for admission to the United States." *Singh*, 113 F.3d at 1514 (citation omitted). That burden "is to establish by clear, unequivocal, and convincing evidence that [Khodagholian's] status has changed." *Id.* (citing *Woodby v. INS*, 385 U.S. 276, 277, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966)). *Accord Matter of Huang*, 19 I. & N. Dec. 749, 754 (BIA 1988) (citing *Woodby*). Thus, combining our substantial evidence review with the underlying INS burden, we review for whether substantial evidence supports a finding by clear, unequivocal, and convincing evidence that Khodagholian abandoned his lawful permanent residence in the United States.

■ Khodagholian sought to re-enter the United States as a "returning resident alien." To qualify for such re-entry, he " 'must be returning to an unrelinquished lawful permanent residence after a temporary visit abroad.' " *Singh*, 113 F.3d at 1514 (quoting *Huang*, 19 I. & N. Dec. at 753) (internal quotation marks and second citation omitted). *Accord Aleem v. Perryman*, 114 F.3d 672, 676 (7th Cir.1997).

■ The crucial inquiry is whether Khodagholian's trips constitute " 'temporary visit[s] abroad.' " *Singh*, 113 F.3d at 1514 (citation omitted). In *Chavez–Ramirez*, after reviewing decades of sporadic caselaw on abandonment, we clarified exactly what a "temporary visit abroad" means:

[A] permanent resident returns from a "temporary visit abroad" only when (a) the permanent resident's visit is for "a period relatively short, fixed by some early event," or (b) the permanent resi-

dent's visit will terminate upon the occurrence of an event having a reasonable possibility of occurring within a relatively short period of time. If as in (b), the length of the visit is contingent upon the occurrence of an event and is not fixed in time and if the event does not occur within a relatively short period of time, the visit will be considered a "temporary visit abroad" only if the alien has a continuous, uninterrupted intention to return to the United States during the entirety of his visit.

*Chavez–Ramirez*, 792 F.2d at 936–37 (internal citations omitted). "The relevant intent is not the intent to return ultimately, but the intent to return to the United States within a relatively short period.... He may extend his trip beyond that relatively short period only if he intends to return to the United States as soon as possible thereafter." *Singh*, 113 F.3d at 1514 (internal citation omitted).

▮ "Some of the factors that could be used to determine whether an alien harbored a continuous, uninterrupted intention to return in addition to the alien's testimony include the alien's family ties, property holdings, and business affiliations within the United States, the duration of the alien's residence in the United States, and the alien's family, property and business ties in the foreign country." *Chavez–Ramirez*, 792 F.2d at 937. It is also appropriate to consider whether the alien's conduct outside the United States evinces an affirmative indication that he intends to remain in the foreign country. *Id.* It is

well settled that "[a]n alien's desire to retain his status as a permanent resident, without more, is not sufficient; his actions must support his professed intent." *Singh*, 113 F.3d at 1515 (citing *Huang*, 19 I. & N. Dec. at 753).

▮ Regarding the three trips, the IJ found that "not any one of these absences" was sufficient to show abandonment, but that only "cumulatively," with all the other factors, could such a finding be established. We conclude that, whether viewed cumulatively or individually, Khodagholian's absences do not support a conclusion that he abandoned his permanent residence in the United States.[3]

Khodagholian was in the United States for a substantial majority of the time between his initial entry in 1993 and the initiation of these proceedings. During that time he made three trips back to his native Iran. Although each of his three trips back to Iran was for a somewhat extended period, those absences did not demonstrate an intent or desire on his part to remain in Iran and give up his LPR status in the United States. To the contrary, during those trips he sold assets and sought to wind up his affairs in Iran. Such actions weigh against the notion that he had abandoned his LPR status in the United States in favor of remaining in Iran.

So, too, does the fact that his wife and children remained in the United States for almost the entire time. They returned to Iran with him for only the first part of the first trip he made, in 1993. Thereafter, they stayed in the United States. At the

---

3. We note that other concerns have been raised about Khodagholian's presence in the United States. Khodagholian's uncle sponsored his green card application and was supposed to have employed Khodagholian upon his arrival, but the IJ ultimately concluded that Khodagholian had not worked for his uncle and may have never intended to do so, alluding to potential entry fraud. In addition,

the government on appeal notes that Khodagholian and his family drew government welfare for their support in this country. That history may underlie the motivation behind this proceeding. The only issue before us, though, and the only possible ground for sustaining the BIA's decision, is whether Khodagholian abandoned his permanent residence in the United States.

time of the IJ's decision, Khodagholian's son was attending college and his daughter high school, both in this country. His wife was unemployed at that time, but previously had worked, also in the United States. It may be true, as the IJ observed, that Khodagholian could tolerate long separations from his wife and children, but that does not support a conclusion that he intended to remain in Iran, separated from them on a permanent basis. He spent a larger share of the time since 1993 together with them, in California.

Nor do other cited reasons for Khodagholian's absences from this country support the claim of abandonment. Notably, according to the IJ, in 1995 Khodagholian returned to Iran for six months to care for his terminally ill mother and for his recently orphaned nephews. Those activities fall within the category of contingencies which had a "reasonable possibility of [terminating] within a relatively short period of time" and thus do not support a conclusion that he had abandoned his LPR status. *Chavez–Ramirez*, 792 F.2d at 937. So do the purposes of the other two trips, to sell property and other assets in Iran and to gather documents needed in the United States.

The unusual duration of the third trip to Iran, when Khodagholian was gone for 15 months, could represent substantial evidence of abandonment in other circumstances. In this case, however, the IJ appears to have recognized (and the government does not contest) that for at least half of that time Khodagholian was required to remain in Iran involuntarily due to the unanticipated tax claim. Since the only evidence regarding the purpose of that trip is that he went to Iran with the intention of selling his house (an action inconsistent with an intent to remain in Iran), this visit would also have "termi-nate[d] upon the occurrence of an event having a reasonable possibility of occurring within a relatively short period of time." *Id.* The fact that he stayed on for just four months after resolving his tax problem cannot reasonably show that he lacked a continuous, uninterrupted intention to return. *Cf. id.* at 937–38 (petitioner left for Mexico to care for her ill mother, but the fact that she stayed on for two and a half years after her mother no longer needed her, married a Mexican, gave birth to a child and acquired a residence in Mexico tipped against a finding of "continuous, uninterrupted intention to return").

Much is made on appeal of Khodagholian's employment and tax history. To be sure, Khodagholian does not seem to have a prosperous career in the United States. His spotty employment history, however, would have more weight if he had a job or business in Iran, but neither the IJ nor the government on appeal asserts that he worked in Iran on any of the trips. In cases where employment has been held against aliens, they have generally worked abroad. *See Aleem*, 114 F.3d at 677–78 (petitioner left for work in Bahrain, taking his wife and kids with him, attempting to return years later); *Alvarez v. Dist. Director*, 539 F.2d 1220, 1225 (9th Cir.1976) (petitioner spent 11 months of each year in the Philippines, where she worked to increase her retirement annuity); *Santos v. INS*, 421 F.2d 1303, 1305 (9th Cir.1970) (petitioner left for "a better job" overseas, leaving behind no ties); *Huang*, 19 I. & N. Dec. at 756 (family moved to Japan for applicant's husband to finish dissertation). *But cf. Singh*, 113 F.3d at 1515 (sporadic employment history in the United States counted against petitioner; however, he spent 78 percent of the time abroad, and had no family or residence in the United States). We believe that the fact that Khodagholian was not consistently employed in the United States weighs against

him in the overall abandonment inquiry, but that is insufficient to overwhelm the other factors showing an intent to reside in the United States. The same goes for taxes. Even though Khodagholian did not file a United States tax return, given the totality of other factors, this fact is insufficient to conclude that he abandoned his residence in the United States.[4]

In sum, from these facts, it cannot reasonably be concluded that the INS carried its burden by clear, unequivocal, and convincing evidence that Khodagholian lacked a "continuous, uninterrupted intention to return to the United States." *Chavez–Ramirez*, 792 F.2d at 937. *Cf. Aleem*, 114 F.3d at 677–78 (parents and children left for Bahrain for father's five-year work contract, but because the contract kept getting extended, it appeared that the employment would "continue indefinitely," therefore cutting against firm intent to return); *Singh*, 113 F.3d at 1515 (only 22% of petitioner's time in the United States; petitioner's "pattern . . . was to live abroad most of the year [with his family] and to spend his summers working in California"); *Huang*, 19 I. & N. Dec. at 756 (holding that a continuous uninterrupted intent was not shown where applicant's husband's five-year Ph.D. in Japan grew to seven years, with no clear end time in sight, and the couple's children resided with them in Japan); *Alvarez*, 539 F.2d at 1224–25 (petitioner spent 11 months of each year in the Philippines, where she worked to increase her retirement annuity and neither resided permanently nor worked in the United States).

## III. CONCLUSION

For the foregoing reasons, we conclude that substantial evidence does not reasonably support a finding that Khodagholian abandoned his lawful permanent residence in the United States. Accordingly, we grant the petition for review and vacate the order of removal.

**PETITION GRANTED; ORDER OF REMOVAL VACATED.**

---

4. The IJ noted that between 1993 and 1997, Khodagholian "did not pay income taxes and during at least part of that period he was paying income taxes in Iran." In support of her finding that Khodagholian retained strong roots in Iran, the IJ again noted that "he has never paid taxes in the United States until recently, but has paid taxes in Iran." The record, however, does not reasonably support these assertions. The only substantial evidence of taxes in the record is for *back taxes* from the sale of his business prior to moving to the United States (for which Khodagholian was held in Iran until payment was made). And no factfinder could reasonably conclude that paying back taxes evinces an intent to abandon the United States. There is no substantial evidence that Khodagholian was paying taxes on current income in Iran in the relevant five year period (from 1993 to 1998).