06-4742-ag

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT
_____

August Term, 2007

(Argued: October 25, 2007                    Decided: October 8, 2008)

Docket No. 06-4742-ag
_____

MICHELLE AMANDA MATADIN,

Petitioner,

v.

MICHAEL B. MUKASEY, Attorney General of the United States,[1]

Respondent.

_____

Before: WALKER, STRAUB, and POOLER, Circuit Judges.

_____

Petitioner seeks review of a decision of the BIA, ordering her removed on the ground that she had abandoned her lawful permanent resident status.  Because the agency assigned the burden of proof to the petitioner, whereas it should have required the government to prove abandonment by clear, unequivocal and convincing evidence, we remand to the agency for further proceedings.

_____

[1]  Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Michael B. Mukasey is automatically substituted for former Attorney General Alberto R. Gonzales as the respondent in this case.

Judge Walker concurs in the judgment of the Court and files a separate concurring opinion.

Harry DeMell, New York, NY, for Petitioner.

Barry J. Pettinato, Senior Litigation Counsel (Francis W. Fraser, Senior Litigation Counsel, Peter D. Keisler, Assistant Attorney General, Civil Division, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for Respondent.

_____

Pooler, Circuit Judge:

This petition to review a decision of the Board of Immigration Appeals ("BIA") primarily concerns the proper allocation of the burden of proof when determining whether a lawful permanent resident ("LPR") has abandoned that status. Michelle Amanda Matadin seeks review of a decision of the BIA ordering her removed on the ground that she had abandoned her lawful permanent resident status. Because the agency allocated the burden of proof incorrectly, we remand to the agency for further proceedings.

## BACKGROUND

Matadin, a native and citizen of Guyana who had been admitted as an LPR, left for Guyana on September 2, 1999, and did not return to the United States until April 28, 2002. The agency found that she had abandoned her LPR status and ordered her deported.

Matadin and her father were admitted to the United States in 1994 as lawful permanent residents, through a sponsorship by Matadin's aunt. Matadin was twelve years old at the time. Upon arrival, Matadin lived with her aunt in Queens, where she attended and graduated from a junior high school. Matadin's mother remained in Guyana and never was admitted into this

2

country as a permanent resident. Matadin's father left New York in 1995, leaving Matadin in the custody of her aunt, and he returned to Guyana in 1996 or 1997. Matadin testified during her deportation hearing that she did not initially return to Guyana with her father because her home was in the United States and she was still in junior high school when he left. On September 2, 1999, Matadin, at age 17, traveled to Guyana. She stated that the purpose of her trip was to take care of her sick father, who had suffered a severe heart attack just prior to her departure. She testified that she was the only person who could take care of him because her siblings all lived outside Guyana, his siblings all lived in the United States, and he was estranged from his wife. She testified that when she brought him home from the hospital, his heart condition was compounded by diabetes and hypertension, leaving him unable to walk. She testified that she remained in Guyana for the next thirty months, while she nursed him to health and attempted to find someone to run his lumber business for him. In April 2002, at age twenty, after she had purportedly nursed him back to health, she returned to the United States. Although her father suffered a mild heart problem shortly before she returned home, she testified that he was doing much better when she left him.[2] According to her testimony, she remained in Guyana solely to take care of her father and her continuing intent during her entire trip abroad was to return to her home in the United States once she could leave him.

During her last year in Guyana, she worked as a sales clerk, but there is no indication of

----

[2] Matadin was able to obtain only scant documentary evidence of her father's illness: a note from a doctor stating that her father had presented himself with chest pains suggestive of heart disease on September 29, 1999; a note from a second doctor stating that he had twice treated her father; and a note from a third doctor stating that her father had presented himself with moderate chest pain and abdominal pain on March 2, 2002. She testified that because of poor record-keeping practices and frequent relocations by Guyanese doctors and clinics, this was all the evidence she was able to obtain despite her best efforts.

how frequently she worked. In June 2001, while in Guyana, she married a Guyanese citizen. She testified that she always intended to bring her husband back to the United States, where she planned to start a family. She testified that she did not ask the Embassy in Guyana whether she could apply for a status adjustment on her husband's behalf while in Guyana because she was overwhelmed by the crisis of her father's care. A few months after returning to the United States, she filed on her husband's behalf a petition to classify him as a lawful permanent resident. Thereafter, he filed for a divorce. In a new relationship, Matadin gave birth to an American citizen child in September 2003, whose father, she testified, continues to help support the child in the United States. She filed an application for her own naturalization in April 2005. She has been employed in New York as a cashier since July 2002.

According to her testimony, Matadin has few meaningful family ties in Guyana: she has siblings, but none of them lives in Guyana; her mother lives in Guyana, but Matadin spoke with her only rarely while she was in Guyana and her mother has not had custody of Matadin since Matadin came to the United States without her mother at age twelve. Regarding her father, she testified that she is not sure whether he is still in Guyana or whether he is still alive: she testified that she called his former neighbors to ask whether they have seen him; she called his former place of business; she called his former doctors; she has contacted members of her family; but she has learned only that his former residence is empty, that he no longer is at his former place of business, and that no one knows where he is.

Upon arriving in New York in 2001, an officer from the Department of Homeland Security ("DHS") took Matadin's sworn statement, in which she indicated that she was a permanent resident returning to her home in the United States. The DHS concluded that she had

abandoned her LPR status and initiated removal proceedings. She was charged with being an immigrant not in possession of a valid entry document, in violation of 8 U.S.C. § 1182(a)(7)(A)(i)(I). A deportation hearing was held on May 9, 2005, and the Immigration Judge ("IJ") (Paul A. Defonzo) rendered an oral decision that day finding her removable as charged. Matadin seeks review of a September 22, 2006, order of the Board of Immigration Appeals ("BIA"), affirming the order of the IJ. See In the Matter of Michelle Amanda Matadin, No. A44 269 993 (BIA September 22, 2006), aff'g No. A44 269 993 (Immig. Ct. N.Y. City May 9, 2005).

At the outset of the removal hearing, the IJ informed Matadin that she bore the burden of proof. In his oral decision, the IJ explained that when, as here, a permanent resident has been continuously absent for more than a year prior to seeking readmission, the resident has the burden to demonstrate that she did not abandon her lawful permanent residence during the course of her absence.

In the oral decision, the IJ found that Matadin "appear[ed] to have only a passing knowledge of her father's actual medical condition while she resided with him in Guyana." In support of this conclusion, the IJ cited Matadin's inability to name the medications her father was taking. During her testimony, she stated the number of pills he was taking and the shape and color of the heart medication, but, more than three years after returning from Guyana, she could not recall the name of any of the medications. The IJ next found that she owned no property in the United States before she left,[3] that she did not work in the United States before departing at

---

[3] During her airport interview, Matadin stated that she did not own any property–either in Guyana or in the United States. The IJ mentioned only her lack of property in the United States.

age seventeen, that she finished school in 1995 and indicated that she had no intention of resuming studies in the United States,[4] that she married a Guyanese national while in Guyana but made no attempt to secure LPR status for him while she was in Guyana,[5] that she "apparently had no contacts with the United States" while in Guyana,[6] that she had given inconsistent testimony concerning whether her father had sustained a second heart attack,[7] and that she was employed for a year as a sales clerk in Guyana. The IJ concluded from the foregoing, and from the length of her absence, that Matadin was not in Guyana solely to care for her father and that she had therefore abandoned her lawful permanent residence in the United States. For this reason, the IJ

---

[4] As the IJ acknowledged, she testified that she was still in school in 1996 or 1997 when her father left for Guyana. She did not testify that she had no intention of resuming studies in the United States.

[5] In her airport interview, Matadin testified that she had no applications pending with the Immigration and Nationality Service. The IJ did not cite any rule or regulation that would allow a lawful permanent resident, who makes a temporary trip abroad and who has therefore not abandoned her United States residence, to file an I-130 petition in Guyana rather than in the district of her residence in the United States. Cf. 8 C.F.R. 204.1(e)(1) ("The [I-130] petition . . . must be filed with the Service office having jurisdiction over the place where the petitioner . . . is residing.").

[6] The record is silent as to whether Matadin maintained any personal contacts in the United States during her time in Guyana. If the IJ was using "contacts" in the broader sense familiar from personal jurisdiction jurisprudence, the IJ was, at best, begging the question: the question in this case is whether Matadin maintained a continual *residence*–a classic type of "contact"--in the United States throughout her trip abroad. In any event, beyond her lack of property in the United States and her continual absence from the United States during the period in question, the record is silent as to what contacts Matadin had or lacked in the United States during her trip abroad.

[7] Matadin had indicated in her airport interview that her father had a second heart attack while she was in Guyana, in March 2002, but she testified at the hearing that her father did not have a second heart attack while she was in Guyana. The IJ did not note–but the government does in its brief–that the medical reports she submitted indicated that her father was admitted to a Guyanese hospital in March 2002 for moderate chest pain. Because her father left the hospital before he could be treated, it is not clear whether or not he had a mild heart attack on that date.

6

ordered her removed.

The BIA affirmed the IJ's decision on September 22, 2006, adding only that the petitioner presented no unforseen circumstances that would explain the delay in her return to the United States, citing United States ex rel. Polymeris v. Trudell, 49 F.2d 730 (2d Cir. 1931), aff'd 284 U.S. 279 (1932).

In both her brief to the BIA and her brief to this Court, Matadin principally contends that the IJ erred by assigning the burden of proof to her, rather than requiring the government to prove that she had abandoned her LPR status by clear, unequivocal and convincing evidence. Because we agree, we vacate the order of removal and remand her case to the agency for further proceedings.

## DISCUSSION

"In cases like this, in which the BIA adopts and affirms the IJ's opinion and supplements it with its own conclusions, we review both the opinion of the IJ and that of the BIA." Sansui v. Gonzales, 445 F.3d 193, 200 (2d Cir. 2006). "Questions of law, including what quantum of evidence will suffice to discharge an applicant's burden of proof, are reviewed de novo." Zhong v. U.S. Dept. of Justice, 480 F.3d 104, 117 (2d Cir. 2007); see also Secaida-Rosales v. INS, 331 F.3d 297, 307 (2d Cir. 2003) ("[U]sing an inappropriately stringent standard when evaluating an applicant's testimony constitutes legal, not factual, error").

"Generally, in order to gain admission into the United States, an immigrant must present a valid, unexpired immigrant visa as well as a valid, unexpired passport or other travel document." Ahmed v. Ashcroft, 286 F.3d 611, 612 (2d Cir. 2002) (per curiam); see 8 U.S.C. § 1181(a). "If a person fails to produce such documents, § 1182(a)(7)(A)(i)(I) requires that he or

7

she be excluded." Id. There are some exceptions to this rule for lawful permanent residents returning to the United States. First, unless, inter alia, a lawful permanent resident has been absent from the United States "for a continuous period in excess of 180 days," she shall not be regarded as seeking admission for immigration law purposes. 8 U.S.C. § 1101(a)(13)(C). And a lawful permanent resident "seeking readmission after a temporary absence of less than 1 year," may present a "valid, unexpired Form I-551, Permanent Resident Card" in lieu of a visa. 8 C.F.R. § 211.1(a)(2). If a lawful permanent resident has remained abroad for a longer period, however, she may still be admitted without entry documents if she qualifies as a returning resident, i.e., "a lawful permanent resident returning from a temporary visit abroad." 8 U.S.C. § 1181(b); 8 U.S.C. § 1101(a)(27)(A).

## I. Burden of Proof

The issue here is what burden of proof an IJ must apply in deportation hearings to determine whether a lawful permanent resident has abandoned her LPR status. The IJ determined that the government normally bears the burden to establish abandonment by clear, unequivocal and convincing evidence, but that if an alien has been absent for more than one year, the burden shifts to the alien to show that she has not abandoned her status. Matadin contends that the IJ's burden-shifting decision constituted legal error. The question of the applicable burden of proof in abandonment cases is before our court for the first time.

In support of the proposition that the burden of proof shifts to the alien after an absence of more than one year, the IJ cited In re Huang, 19 I & N Dec. 749 (BIA 1988) and a DHS regulation, 8 C.F.R. § 211.1(a)(2). Neither authority supports the IJ's contention. Huang announces no such rule. In Huang, the Board required the government to establish abandonment

8

by "clear, unequivocal, and convincing evidence" whenever the petitioner presents a "colorable claim" to returning resident status. Id. at 754. Huang made no exception for petitioners who had been continually absent for more than a year. Nor does 8 C.F.R. § 211.1(a)(2) provide that the burden of proof shifts to the alien after a one-year absence. As mentioned above, that regulation provides only that a returning permanent resident may present a valid I-551 form in lieu of a visa. Indeed, we have found no statute or regulation that speaks to the burden of proof applicable to determining whether an alien who has been absent more than a year has abandoned her LPR status. This is not surprising because "the question of what degree of proof is required in deportation proceedings . . . is the kind of question which has traditionally been left to the judiciary to resolve." Woodby v. INS, 385 U.S. 276, 284 (1966).

Where, as here, there is no explicit, contrary directive from Congress, "no deportation order may be entered" against a resident alien "unless it is found by clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation are true." Id. at 286; see also Berenyi v. Immigration Dir., 385 U.S. 630, 636-37 (1967) ("When the Government seeks to strip a person of citizenship already acquired, or deport a resident alien and send him from our shores, it carries the heavy burden of proving its case by 'clear, unequivocal, and convincing evidence.' . . . [T]hat status, once granted, cannot lightly be taken away . . . ." (footnotes omitted)); Francis v. Gonzales, 442 F.3d 131, 138-39 (2d Cir. 2006) (holding that, when seeking to deport an LPR because a criminal conviction rendered her inadmissible at the time her status was adjusted, the government must prove the conviction by "clear, unequivocal and convincing evidence). Because Matadin left the country as a LPR and the sole question, which is colorable, is whether she abandoned that status during her trip abroad, the DHS bore the burden of proving

by clear, unequivocal and convincing evidence that Matadin had abandoned her LPR status.

Two circuits that have reached this issue, subsequent to the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, have concluded that the government must prove abandonment by clear, unequivocal and convincing evidence. See Hana v. Gonzales, 400 F.3d 472, 476 (6th Cir. 2005) ("Our task in this case . . . is to determine whether we are compelled to conclude that, contrary to the Board's finding, the record does not contain clear, unequivocal, and convincing evidence that [the petitioner] abandoned her LPR status in the United States."); Khodagholian v. Ashcroft, 335 F.3d 1003, 1006 (9th Cir. 2003) (same). In each of these cases, this burden applied notwithstanding lengthy absences from the country: in Hana, the petitioner had been absent for over a year when she returned, and for most of the previous four and a half years, 400 F.3d at 473-74; in Khodagholian, the petitioner had been absent for fifteen months, 335 F.3d at 1008. The BIA and the Ninth Circuit have held that this burden applies whenever the applicant presents a "colorable claim" to returning resident status. Matter of Huang, 19 I. & N. at 754; Khodagholian, 335 F.3d at 1006. We agree. Once the IJ determined that Matadin's claim to returning resident status was colorable, the IJ should have required the government to prove abandonment by clear, unequivocal and convincing evidence. It was legal error not to do so.

## II. Remand

Where, as here, the agency's decision is beset by error, "[a] court of appeals is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." Gonzales v. Thomas, 547 U.S. 183, 186 (2006) (internal quotation marks omitted). "Rather, the proper course, except in rare circumstances, is

10

to remand to the agency for additional investigation or explanation." Id. (internal quotation marks omitted). We have held that we may deny a petition for review of an order of deportation, notwithstanding errors, when we have assured confidence that the agency would have reached the same decision had it not erred. See, e.g., Xiao Ji Chen v. U.S. Dep't of Justice, 471 F.3d 315, 338-39 (2d Cir. 2006). But Gonzales and Chenery teach that this course is proper only in rare circumstances. See SEC v. Chenery, 318 U.S. 80, 88 (1943) ("For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency."). This is not such a rare circumstance.

"[T]he determinative issue" in the deportation hearing was whether the alien's trip qualified as a "temporary visit abroad." Ahmed, 286 F.3d at 612-13. Given that the agency's decision was beset by legal error, the question is whether we can have assured confidence that the agency, on remand, would conclude that Matadin's trip was not a temporary visit abroad. We can have no such confidence. If Matadin's claimed reason for remaining in Guyana were accepted, her trip would seem to qualify as a temporary trip abroad under our case law. See Ahmed, 286 F.3d at 613 ("When the length of the visit is not fixed by some early event but instead relies upon an event with a reasonable possibility of occurring within a short period of time, what constitutes a temporary visit 'cannot be defined in terms of elapsed time alone. Then the intention of the visitor, when it can be determined, will control.'" (quoting United States ex rel. Polymeris v. Trudell, 49 F.2d 730, 732 (2d Cir. 1931)); Polymeris, 49 F.2d at 732 (The petitioners "brought themselves well within the claimed status as immigrants once lawfully admitted who were returning from a temporary visit abroad" when "[t]hey always intended to come back as soon as they could," but the timing of their return "depended upon the condition of

11

health of [a petitioner's] husband" and, after he died, "upon the time required for them to remain to attend to the settlement of his estate. Surely this was all a matter of time which might be relatively short," even though their return ultimately was delayed by several years).

Therefore, the deportation order against Matadin must be based, if on anything, on the factual findings in this case. But the agency has not made any relevant factual findings. As discussed, the IJ and the BIA applied an erroneous legal standard in making the factual findings and in determining whether Matadin had abandoned her LPR status. In light of this erroneous standard of proof, the IJ's factual finding that Matadin was not in Guyana solely to care for her sick father meant only that, according to the IJ, Matadin had not shown by a preponderance of the evidence that she was in Guyana solely to care for sick father. This was not a suitable, or relevant, factual finding. Rather, the relevant factual inquiry was whether it could be "found by clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation [were] true." Woodby, 385 U.S. at 286; see also Huang, 19 I. & N. Dec. at 754 (adopting rule of Woodby that "in deportation hearings [against those with a colorable claim to returning resident status] the Service must establish facts supporting deportability by clear, unequivocal, and convincing evidence" (emphasis added)).

Because "we may not enforce [an agency's] order by applying a legal standard the [agency] did not adopt," NLRB v. Kentucky River Cmty. Care, Inc., 532 U.S. 706, 721 (2001), we may not ourselves engage in fact-finding under the appropriate legal standard to determine whether Matadin had abandoned her status. See Jigme Wangchuck v. DHS, 448 F.3d 524, 531-533 (2d Cir. 2006) (holding that remand was necessary under Kentucky River when agency had applied inappropriately low burden of proof); see also Woodby, 385 U.S. at 279, 286

12

(remanding to the agency, without any futility analysis, when the agency assigned an inappropriately low burden of proof to the government); cf. Cao He Lin v. United States DOJ, 428 F.3d 391, 400 (2d Cir. 2005) ("To assume a hypothetical basis for the IJ's determination, even one based in the record, would usurp her role."). The BIA's conclusion that Matadin abandoned her LPR status therefore cannot stand. Because "[t]he matter requires determining the facts," Gonzales, 547 U.S. at 186, and because the agency has not yet determined the facts utilizing the appropriate burden of proof, we follow the ordinary remand rule and vacate and remand to the agency for further factual findings.

For the foregoing reasons, the petition for review is GRANTED; the decision of the BIA is VACATED; and the case is REMANDED for further proceedings consistent with this opinion. The stay previously granted by this court is VACATED as moot.

No. 06-4742-ag
Matadin v. Mukasey

WALKER, Circuit Judge, concurring in the judgment:

The issue in this case is how an immigration judge should proceed in determining whether an alien is a returning resident. Specifically, the question is who bears the burden of proof in these circumstances: must the government show that the alien abandoned her LPR status, or is it incumbent on the alien to show that no such abandonment occurred?  In In re Huang, 19 I & N Dec. 749 (BIA 1989), the BIA decided this question by adopting a two-step analysis.  First, the alien must demonstrate "a colorable claim to returning resident status."  Id. at 754.  If she does so, the burden shifts to the government to "show that the applicant should be deprived of her status as a lawful permanent resident."  Id.  The IJ initially followed this procedure, but then departed from it and shifted the burden back to Matadin because she had remained out of the United States for over a year.  I concur in the judgment because I agree that the IJ erred in doing so; neither Huang nor any other case, statute, or regulation supports the novel burden-shifting rule applied by the IJ in this case.

I part ways with my colleagues, however, as to the significance of In re Huang.  The majority relies heavily on

14

Woodby v. INS, 385 U.S. 276 (1966), but Woodby offers no guidance as to the proper allocation of the burden of proof because it was undisputed in that case that the government bore the burden. See id. at 277 ("The question presented by these cases is what burden of proof the Government must sustain in deportation proceedings."). However, in Huang, the BIA expressly decided the issue presented by this case.

It is beyond cavil that "[w]hen reviewing the BIA's interpretation of statutes that it administers, we apply the Chevron [U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984)] principles." Shi Liang Lin v. U.S. Dept. of Justice, 494 F.3d 296, 304 (2d Cir. 2007) (en banc). However, the question of whether the Huang decision involves statutory interpretation or otherwise triggers our Chevron analysis presents more difficulty; commentators refer to this inquiry, which "must be made in deciding whether courts should turn to the Chevron framework at all," as Chevron "step zero." Thomas W. Merrill & Kristin E. Hickman, Chevron's Domain, 89 Geo. L.J. 833, 836 (2001); see also Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187, 191 (2006) (noting that these inquiries currently constitute "the most important and confusing questions" in the development of Chevron doctrine). In Huang, the BIA, citing 8 U.S.C. § 1361, noted that "the burden of proving admissibility is generally on the applicant in exclusion proceedings," but held

15

that this burden shifted to the government when, as in this case, the applicant demonstrated "a colorable claim to returning resident status." Huang, 19 I & N Dec. at 754. Thus, it is certainly possible to view the Huang decision as one interpreting the Immigration and Naturalization Act, and therefore conclude that we must determine whether this decision commands deference under the familiar two-step analysis of Chevron.

I would not reach the thorny question of what amount of deference the BIA's Huang decision commands because, even if we assume that we could review the matter de novo, I believe the Huang decision articulates the proper framework for allocating the burden of proof in this case. Nothing in the parties' briefs or the majority opinion suggests that the analysis in Huang is erroneous. It is equally clear that the IJ's decision to shift the burden back to Matadin was erroneous in light of Huang.

The only remaining question is whether remand would be futile. We have found futility where, e.g., "the untainted evidence in support [of] the IJ's conclusion is so 'overwhelming' that there is no realistic possibility of a different result on remand." Xiao Ji Chen v. U.S. Dep't of Justice, 471 F.3d 315, 338 (2d Cir. 2006). In this case, the question of futility is exceedingly close, as most of the evidence aside from Matadin's testimony suggests that her trip was not a temporary visit. First, while the length of stay is not dispositive, a thirty-one

16

month absence strongly suggests that a trip is not temporary, and abandonment has been found based on shorter trips. See Singh v. Ashcroft 100 F. App'x 628 (9th Cir. 2004) (unpublished opinion) (23 months); Iqbal v. Ashcroft, 84 F. App'x 391 (5th Cir. 2003) (unpublished per curiam) (25 months, according to the parties' briefs). Second, none of Matadin's parents or siblings resided in the United States at the time of her departure and, during her stay in Guyana, both of her parents lived there. In addition, she married a Guyanese man during her visit, and did not even explore the possibility of either her or her husband returning to the U.S. while in Guyana. Cf. Hana v. Gonzales, 400 F.3d 472, 474, 476 (6th Cir. 2005) (finding alien's diligence while abroad in attempting to secure entry visas for family, and in obtaining her own reentry visa prior to departure, critical to finding of intent to return); United States ex rel. Polymeris v. Trudell, 49 F.2d 730, 731 (2d Cir. 1931) (finding a temporary visit when aliens, upon leaving, "executed an affidavit showing their intention to return within six months," and contacted the American Consul before that period expired when "it became apparent that they needed to remain longer"). For the two years prior to her departure, she did not pursue any study or employment, but she did take a job after she arrived in Guyana. And before leaving the U.S., she had spent twelve years in Guyana, and only five years in the U.S.

17

The only evidence offered in support of a finding of a temporary visit is Matadin's claim that she left the U.S. to care for her father and intended to return as soon as he recovered his health.  The extrinsic evidence of her father's health, however, does not suggest either a downturn prior to September 1999 (when Matadin allegedly left the U.S. to care for him) or an upturn around April 2002 (when she returned to the U.S.).  The documents Matadin attempted to introduce at the hearing (letters from Mr. Matadin's doctors) only indicate that her father was examined for heart pains on September 29, 1999, almost one month after Matadin had already left the U.S.  In addition, at her entry interview with INS at JFK Airport, she stated that her father had had a second heart attack on March 15, roughly a month before she left Guyana, which would suggest that she left, contrary to her testimony, in spite of her father's ill health.

Nevertheless, the IJ improperly concluded that Matadin bore the burden of proof and the accompanying risk of nonpersuasion.  It is possible that a reasonable factfinder could find the evidence as to the nature of Matadin's trip equivocal, in which case the party who does not bear the burden of proof should prevail.  As a result, Matadin's failure to introduce persuasive evidence of her continuous intent to return to the United States does not necessarily doom her claim, just as a criminal defendant may prevail without adducing any evidence at all.  Accordingly, I

18

concur in the judgment vacating the BIA's decision and remanding to the agency for further proceedings.