Interim Decision #1291

MATTER OF BAUER

In DEPORTATION Proceedings

A-8599958

*Decided by Board June 11, 1963*

(1) Respondent, a lawful permanent resident of the United States, who in 1956 when he was 16 departed with his mother and stepfather to Germany where the latter was assigned to a tour of military duty and in 1959 when he was 19 returned to the U.S. with his parents, again under military orders of his stepfather, did not upon his return make an entry within the meaning of section 101(a)(13) of the Immigration and Nationality, since he was an unemancipated minor under the legal compulsion to follow and accompany his parents and his departure to and presence in a foreign place was not voluntary nor intended by him.

(2) Therefore, respondent's return to the United States in 1959 does not constitute an entry on which to predicate a ground of deportation under section 241(a)(4) of the Act on the basis of his conviction on March 25, 1960, of a crime involving moral turpitude.

CHARGE:

Warrant: Act of 1952—Section 241(a)(4) [8 U.S.C. 1251(a)(4)]—Crime within five years after entry—Atrocious assault and battery.

The case comes forward on appeal by the trial attorney from the decision of the special inquiry officer dated December 19, 1962 terminating the proceedings.

The record relates to a native and citizen of Germany, 23 years old, male, single, who originally entered the United States for permanent residence on January 9, 1954. On March 25, 1960 in the County Court of Ocean County, New Jersey, the respondent was convicted of atrocious assault and battery with a knife committed on December 21, 1959, as more fully set forth in the indictment and was sentenced to confinement in the Bordentown Reformatory for an indeterminate term. On August 24, 1960 the special inquiry officer found the respondent deportable as charged as one who committed a crime involving moral turpitude within five years after his last entry and was sentenced to confinement for a year or more within five years after his alleged last entry on August 31, 1959. On January 17, 1962 counsel

304

for the respondent filed a motion for reopening and reconsideration on the grounds (1) that there was not sufficient proof upon which the special inquiry officer could properly determine the question of the respondent's entry or reentry into the United States; (2) that the respondent did not enter or reenter the United States within five years of the commission of the crime of atrocious assault and battery on December 21, 1959; and (3) that the respondent desired to produce proof that his entry into the United States was not an entry pursuant to the definition of section 101(a) (13) of the Immigration and Nationality Act. On January 25, 1962 the special inquiry officer granted the motion to reopen and on November 16, 1962 granted the government's motion to reopen in connection with an application for adjustment of status under section 245 of the Immigration and Nationality Act.

According to respondent's birth certificate he was born on February 18, 1940 (Ex. 3) at Schweinfurt, Germany although his testimony is to the effect that he was born February 18, 1942 (p. 17). We will accept the birth certificate as being the correct date of birth. His father was killed in the Second World War and his mother married a United States citizen, a sergeant in the United States Army in October 1953. The respondent, his mother and stepfather came to the United States in January 1954 when the respondent was admitted for permanent residence. He resided with his stepfather and mother. In August or September 1956 the respondent's stepfather was assigned to a new tour of duty in Germany and the respondent and his mother were included in the orders and accompanied the respondent's stepfather to Germany (Ex. 5). The respondent lived with his stepfather and mother, went to high school and to the University of Maryland Extension Branch and returned to the United States in August or September 1959 when his stepfather was transferred to this country under military orders. The respondent was 16 years of age at the time he departed and 19 years of age when he returned. During all this period he was an unemancipated minor, in the custody and subject to the control of his stepfather. It is believed that the New Jersey statute and New Jersey cases cited by the trial attorney confirm the conclusion that the respondent, as an unemancipated infant, was under a duty to obey the order of his parents, in this case the stepfather.

The issue in the case is whether the respondent made an entry into the United States upon his return from Germany. The term "entry" is defined in section 101(a) (13) of the Immigration and Nationality Act, 8 U.S.C. 1101(a) (13) as follows:

The term "entry" means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the

United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary: . . .

In commenting on the exception contained in the latter portion of this definition, the framers of the legislation explained that "however, for the purpose of determining the effect of a subsequent entry upon the status of an alien who has previously entered the United States and resided therein, the preciseness of the term 'entry' has not been found to be as apparent." More recently, the courts have departed from the rigidity of that rule and recognized that an alien does not make an entry upon his return to the United States from a foreign country where he had no intent to leave the United States (*DiPasquale* v. *Karnuth*, 158 F. 2d 878 (2d Cir. 1947)) nor did not leave the country voluntarily (*Delgadillo* v. *Carmichael*, 332 U.S. 388 (1947)); the bill defines the term "entry" as precisely as practicable, giving due recognition to the judicial precedents. Thus any coming of an alien from a foreign port or place or an outlying possession into the United States is to be considered an entry, whether voluntary or otherwise, unless the Attorney General is satisfied that the departure of the alien, other than a deportee, from this country was unintentional or was not voluntary.[1]

In the case of *DiPasquale* v. *Karnuth*,[2] it was held that no "entry" within the contemplation of the immigration laws had been made by an alien who returned to the United States as soon as practicable following an unintended and unwitting departure which occurred when the train upon which he was traveling between points in the United States crossed the international border without the alien's knowledge, and indeed while he was sleeping. The case of *Delgadillo* v. *Carmichael*,[3] involved a Mexican alien who had made a legal entry into the United States in 1923, resided here until 1942 when he shipped out as a member of the crew of an American merchant ship which was torpedoed and the alien was then taken to Cuba where he remained for one week and then was returned to the United States. Deportation was sought on the ground that he had been sentenced to imprisonment for one year or more because of conviction of a crime involving moral turpitude committed within five years after his alleged entry in 1942. The Supreme Court reversed the Ninth Circuit Court of Appeals, following with approval the construction placed upon the word "entry"

---

[1] 2 U.S. Code Cong., and Adm. News, 82nd Cong., 2d Sess., p. 1683.
[2] 158 F.2d 878 (2d Cir. 1947).
[3] 332 U.S. 388 (1947).

by *DiPasquale* v. *Karnuth*,[4] holding that the alien in that case did not make an entry within the meaning of the immigration laws; refusing to attribute to Congress a purpose to make his right to remain here dependent on circumstances so fortuitous and capricious as those which existed in that case; in effect, holding that where an alien's departure to or presence in a foreign country was involuntary, no entry was, in law, made upon the alien's return to the United States.

The court in *Carmichael* v. *Devaney*,[5] held that a resident of the United States who served in the United States Maritime Service during the Second World War and who returned to the United States after his ship had entered several foreign ports, did not make an "entry" within the immigration laws when returning to the United States because it was not his voluntary act but the exigencies of war in which he was a participant that brought him to foreign ports. To like effect it has been held that an alien who, while residing in the United States, is inducted into the Armed Forces and during his tour of duty serves in a foreign country is regarded as being physically present in this country during all of the time. And that his return to this country as a member of the Armed Forces does not constitute an entry.[6]

It is true that the facts in the present case differ from those existing in the cited cases which led to the present definition of the term "entry" as used in section 101(a)(13) of the Immigration and Nationality Act. However, the facts are substantially similar to those existing in *U.S. ex rel. Valenti* v. *Karnuth*.[7] That case involves a schoolboy of 16 in an American public school who went with his teacher and the class for a picnic to a Canadian beach. The court held that in the decisions on the subject of departure and reentry of an alien, there is a necessary implication that the acts of the alien were at all times voluntary and free from restraint of any kind, and that there was entire liberty on his part to leave or not to leave, to reenter or not to reenter, as he pleased. The court held that the minor schoolboy in that case could not possess the freedom of action to decide whether or not he would go; he was not a free agent acting entirely of his own volition; he was under compulsion as if he were in the schoolroom and was not voluntarily departing from and reentering the country within the meaning of the statute; on the contrary, he was under compulsion both when he left for and when he returned from such picnic. The compulsion under which the relator may be presumed

---

[4] See [2].
[5] 170 F.2d 239 (9th Cir. 1948).
[6] *Matter of J—M—D—*, 7 I. & N. Dec. 105.
[7] 1 F. Supp. 370 (N.D.N.Y., 1932).

to have acted serves to distinguish his case from cases where the departure was purely voluntary.

It is contended that the *Valenti* case has been repudiated in *U.S. ex rel. Dombrowski* v. *Karnuth*, 19 F. Supp. 222 (W.D.N.Y., 1937) and *Drachmos* v. *Hughes*, 26 F. Supp. 192, 194 (W.D.N.Y., 1937). However, neither of those cases involves a minor and the same answer may be made in the case of *U.S. ex rel. Betty* v. *Day*, 23 F. 2d 489, in which the reentry of the relator did not occur during minority. The principle of the *Valenti* case, *i.e.*, voluntariness, has been followed in a number of administrative decisions.[8]

In the present case the respondent departed with his mother and stepfather, who was in military service and under order to Germany when he was 16 years of age and returned when he was 19 years of age. It has been shown that the respondent was an unemancipated minor, under the custody and control of his parents, and he had no choice nor was he asked whether he would depart. Under the law in the State of New Jersey it was incumbent upon the minor respondent to obey the directions of his parents and he was obliged to follow and accompany his stepfather when the stepfather so directed. We do not reach the question of whether the respondent's stepfather's departure under military orders was a factor in the case. What is important is that the respondent was under a legal compulsion to follow and accompany his parents. Being under such compulsion, his case appears to be undistinguishable from *U.S. ex rel. Valenti* v. *Karnuth*.[9] It is believed that the respondent has established that he falls within the exception set forth in section 101(a)(13) of the Immigration and Nationality Act in that his departure to a foreign place was not intended by him or his presence in a foreign place was not voluntary. It is concluded that at the time of his last return on August 31, 1959, the respondent had not in contemplation of law made a reentry. Of course, as regards his original entry on January 9, 1954, the definition of the term "entry" eliminates the question of voluntariness. The appeal will be dismissed.

ORDER: It is ordered that the appeal of the trial attorney from the decision of the special inquiry officer dated December 19, 1962 terminating the proceedings be and the same is hereby dismissed.

---

[8] *Matter of T—*, 4 I. & N. Dec. 235 (1951) ; *Matter of P—*, 5 I. & N. Dec. 220 (1953) ; *Matter of C—*, 5 I. & N. Dec. 370 (1953) ; unreported *Matter of C— N—*, A-8410653 (September 30, 1960 motion to reconsider denied January 27, 1961).

[9] 1 F. Supp. 370 (N.D.N.Y., 1932).