**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SALAR KHOSHFAHM,

Petitioner,

v.

ERIC H. HOLDER JR., Attorney General,

Respondent.

No. 10-71066

Agency No.
A047-544-008

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
June 8, 2011—Pasadena, California

Filed August 25, 2011

Before: Betty B. Fletcher and N. Randy Smith,
Circuit Judges, and Rudi M. Brewster, District Judge.*

Opinion by Judge B. Fletcher;
Concurrence by Judge N.R. Smith

_____

*The Honorable Rudi M. Brewster, Senior District Judge for the U.S.
District Court for Southern California, San Diego, sitting by designation.

## COUNSEL

Nadia Farah, Law Office of Nadia Farah, Tracy, California, for the petitioner.

Aimee J. Frederickson (argued), United States Department of Justice, Office of Immigration Litigation, Washington, DC, for the respondent.

## OPINION

B. FLETCHER, Circuit Judge:

Petitioner Salar Khoshfahm ("Khoshfahm") seeks review of a March 8, 2010 decision of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") finding of removability and denial of his application for asy-

lum and withholding of removal. The BIA affirmed the IJ's conclusion that Khoshfahm, who lived for approximately six continuous years with his parents in Iran, abandoned his lawful permanent resident ("LPR") status. The BIA also affirmed the IJ's determination that Khoshfahm failed to meet his burden of proof as to eligibility for asylum and withholding of removal. Khoshfahm timely appealed. We have jurisdiction under 8 U.S.C. § 1252, and we grant the petition.

## I.

Khoshfahm was born in 1988, in Tabriz, Iran. In 2001, when he was thirteen, he came with his parents to the United States. He and his parents obtained LPR status through a petition filed on their behalf by Khoshfahm's United States citizen uncle, who lives in Sacramento, California. Khoshfahm and his parents lived in the United States with this uncle for seven months. Khoshfahm's father worked for about three of those months in the security department of a company, while his mother remained at home. Khoshfahm believes that his father opened a bank account while he was working. His father then quit his job because the family decided to go back to Iran to sell the property they owned there in order to raise money to live in the United States. His parents did not sell the house that they owned in Tabriz before they traveled to this country because they had only six months to prepare for the journey.

Khoshfahm testified that it was always his family's intent to return to the United States after selling their property. The terrorist attacks of September 11, 2001, however, occurred one week after their return to Iran, and Khoshfahm's family had difficulty obtaining an airline ticket for two or three months thereafter. Then, in November of 2001, Khoshfahm's father became ill with a heart condition, for which he had to be hospitalized. His heart condition restricted his ability to travel. This condition, and the resulting travel restriction,

lasted for several years. Khoshfahm's mother stayed in Iran to care for his father.

Khoshfahm finished middle school and then high school in Iran. He testified that he "always wanted" to return to the United States, but that he had to remain in Iran until he was 18 due to Iran's obligatory military service, and because, before turning 18, he possessed a merely temporary passport and could not "go [on] prolonged trips outside" the country by himself. Khoshfahm explained that the Iranian government would not issue him a permanent passport until he had either fulfilled or been excused from Iranian military service. Khoshfahm was eventually excused from military service and, when he turned 18, he obtained a permanent passport, which allowed him to return to the United States.

On February 28, 2007, approximately five months after his eighteenth birthday, Khoshfahm arrived at San Francisco International Airport and applied for admission to the United States as a returning resident. Khoshfahm was paroled into the United States for deferred inspection. Khoshfahm's parole was thereafter revoked. On March 21, 2007, the Department of Homeland Security ("DHS") filed with the Immigration Court a Notice to Appear charging him with inadmissability under § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1182(a)(7)(A)(i)(I), as an immigrant who at the time of application for admission was not in possession of a valid entry document.

A hearing on the charge of removability was held before the IJ. When the IJ asked him where his parents were at the time, Khoshfahm testified, *inter alia*, that his father's heart condition (which had prevented him from traveling) had recently "improved," but that his parents were waiting for a decision in Khoshfahm's case before returning to the United States.[1]

---

[1]At oral argument, however, Khoshfahm's counsel indicated that Khoshfahm's parents did indeed return to the United States after Khosh-

On November 7, 2007, the IJ issued a decision finding Khoshfahm removable as charged and denying his applications for asylum and withholding of removal. Khoshfahm timely appealed the IJ's decision to the BIA, and, on March 8, 2010, the BIA dismissed the appeal. The BIA agreed with the IJ that, because Khoshfahm was only thirteen at the time his family returned to Iran and was "an unemancipated minor for essentially all of the period abroad in question," it was proper to look to the intent of Khoshfahm's parents in determining whether he had abandoned his lawful permanent resident status. The BIA found no clear error in the IJ's finding that Khoshfahm's parents did not have a continuous, uninterrupted intention to return to the United States during the entirety of their visit to Iran. Accordingly, the BIA concluded that Khoshfahm had abandoned his lawful permanent resident status. The BIA also affirmed the IJ's finding that Khoshfahm, while credible, had not satisfied his burden of proof for asylum and withholding of removal. Khoshfahm timely appealed the BIA's decision with respect to abandonment of his LPR status and his petitions for asylum and withholding of removal.

## II.

In this case, the BIA agreed with the findings and conclusions reached by the IJ, but it also provided its own reasoning as to the issue of abandonment. In evaluating the BIA's decision, we review de novo questions of law, but "defer to the BIA's interpretation of immigration laws unless the interpretation is 'clearly contrary to the plain and sensible meaning of the statute.' " *Mercado-Zazueta v. Holder*, 580 F.3d 1102, 1104 (9th Cir. 2009) (quoting *Mota v. Mukasey*, 543 F.3d

fahm's hearing and were "admitted as legal permanent residents." According to counsel, Khoshfahm's father passed away last year but his mother currently lives in this country. The government did not dispute these representations.

1165, 1167 (9th Cir. 2008)). Factual findings are reviewed for substantial evidence, meaning that they are reversed if a "reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

## III.

### A.    Abandonment of LPR Status

**[1]** The government maintains that, by the time Koshfahm sought reentry into the United States, he had abandoned his LPR status. "When an applicant has a colorable claim to returning resident status," the government "has the burden of proving he is not eligible for admission to the United States." *Singh v. Reno*, 113 F.3d 1512, 1514 (9th Cir. 1997). The government must establish by "clear, unequivocal, and convincing evidence" that this status has changed or been abandoned. *Id.* On its face, abandonment of immigration status appears to be a legal inquiry. We have held, however, that, because whether a petitioner has abandoned his LPR status is an intrinsically fact-specific question, we review the BIA's determination as to abandonment under the substantial evidence standard. *Khodagholian v. Ashcroft*, 335 F.3d 1003, 1006 (9th Cir. 2003) (citations omitted). Thus, in reviewing the BIA's decision, we must determine whether there is (1) substantial evidence that (2) the government has offered "clear, unequivocal, and convincing evidence" of (3) the ultimate finding necessary to support the abandonment of lawful status. *See Singh*, 113 F.3d at 1517 (Reinhardt, J., dissenting).

**[2]** We now consider what the government must prove by "clear, unequivocal, and convincing evidence" in order to establish abandonment of LPR status. "[I]n order to qualify as a returning resident alien, an alien must have acquired lawful permanent resident status in accordance with our laws, must have retained that status from the time he acquired it, and must be returning to an 'unrelinquished lawful permanent residence' after a 'temporary visit abroad.' " *Singh*, 113 F.3d at

1514 (quoting *Matter of Huang*, 19 I. & N. Dec. 749, 753 (1988)). "A trip is a 'temporary visit abroad' if (a) it is for a 'relatively short' period, fixed by some early event; or (b) the trip will terminate upon the occurrence of an event that has a reasonable possibility of occurring within a relatively short period of time." *Id.* (citation omitted). If the alien's trip abroad is not "relatively short," it is a "temporary visit abroad" only if the alien has "a continuous, uninterrupted intention to return to the United States during the entirety of his visit." *Id.* (citing *Chavez-Ramirez v. INS*, 792 F.2d 932, 937 (9th Cir. 1986)). In other words, a legal permanent resident "may extend his trip beyond that relatively short period only if he intends to return to the United States as soon as possible thereafter." *Id.*

**[3]** Thus, because it is the government that has the burden of proof with respect to abandonment of status, *id.*, it must show by "clear, unequivocal, and convincing evidence" that the petitioner's trip abroad was not "relatively short" and that the petitioner did not maintain a "continuous, uninterrupted intention to return to the United States," thereby abandoning his status. We review for substantial evidence the BIA's conclusion that the government met this burden.

## B.   Imputation of Abandonment

Here, the BIA agreed with the IJ that, because Khoshfahm was an unemancipated minor for almost the entire period that he lived in Iran, it should look to the intent of Khoshfahm's parents to determine whether he had abandoned his LPR status by the time he attempted to reenter the United States. Because it concluded that Khoshfahm's parents had in fact abandoned their LPR status, it imputed this abandonment to Khoshfahm.

**[4]** Under BIA precedent, if a petitioner's parent abandons his or her LPR status while the petitioner is in his or her custody and control, then the parental abandonment must be

imputed to the child. *See Matter of Huang*, 19 I. & N. Dec. at 750 n.1 ("Abandonment of lawful permanent resident status of a parent is imputed to a minor child who is subject to the parent's custody and control."); *Matter of Zamora*, 17 I. & N. Dec. 395, 396 (BIA 1980) ("We hold that this voluntary and intended abandonment by the mother is imputed to the applicant, who was an unemancipated minor . . . at the time his mother abandoned her lawful resident status."); *Matter of Winkens*, 15 I. & N. Dec. 451, 452 (BIA 1975) (holding that "[t]he abandonment of [the parents of petitioner's] permanent resident status is imputed to [petitioner], who was subject to their custody and control" when they abandoned).

**[5]** These decisions are loosely derived from the BIA's prior decision in *Matter of Bauer*, 10 I & N. Dec. 304 (BIA 1963). There, the BIA held that no "reentry" under INA § 101(a)(13) was made by the 19-year-old petitioner upon his return to the United States three years after departing this country in the custody and control of his parents. *Id.* at 308. The BIA reasoned that because the petitioner was under "a legal compulsion to follow and accompany his parents" that rendered his departure involuntary, he had made no "reentry" upon his return on which to predicate a ground of deportation. *Id. Matter of Zamora*, 17 I. & N. Dec. at 397, expressly overrules *Bauer*, but states that "to the extent that *Matter of Bauer* . . . can be cited for the general proposition that, because a minor child is compelled to accompany his parents if they depart from the United States, the intent of the parents with regard to the departure (i.e., whether or not they, the parents, intend to abandon their resident status) is imputed to the accompanying child, *Bauer* still stands." It is not clear, however, that *Bauer* does stand for this general proposition, and *Matter of Zamora* cites to no other authority to support its reasoning. As a result, the source of the BIA's position with respect to imputation of abandonment of LPR status remains obscure.

Nevertheless, we agree with our concurring colleague that, because the BIA is charged with explaining what constitutes

a "returning resident immigrant within the meaning of [INA § 101(a)(27)(A)]," *id.*, we defer to its interpretation to the extent that it is reasonable. *Cf. Trung Thanh Hoang v. Holder*, 641 F.3d 1157, 1160 (9th Cir. 2011) (noting that we apply *Chevron* deference "to the BIA's reasonable interpretations of ambiguous terms in the INA"); *Abebe v. Gonzales*, 493 F.3d 1092, 1100-01 (9th Cir. 2007) (noting that the "principles of deference to administrative agency decisions . . . are applicable when a court reviews the BIA's interpretation of the [INA]").

**[6]** Imputation of abandonment of LPR status from parents to child is, in many cases, consistent with our precedent. Although we have never expressly opined on the issue, we do in several other areas of immigration law impute "the parent's status, intent, or state of mind" to a child residing with the parent. *See Saucedo-Arevalo v. Holder*, 636 F.3d 532, 532-33 (9th Cir. 2011) (listing cases). As we have firmly recognized, "children are, legally speaking, incapable of forming the necessary intent to remain indefinitely in a particular place . . . and thus cannot determine their own domicile . . . ." *Mercado-Zazueta*, 580 F.3d at 1106 (holding that imputation applies for purposes of the five-year permanent residence requirement) (internal citations and quotation marks omitted). Because a child cannot legally form an intent as to his domicile, imputation from parent to child of abandonment of LPR status while the child is in the parents' custody and control is certainly, in cases such as this, reasonable.[2]

---

[2]The inability of a child to form an intent as to domicile does not, however, support imputation of abandonment of LPR status in every circumstance. Assume, for example, that LPR parents leave the country, but their LPR child stays in the United States to attend school or live with a relative. The parents' length of stay abroad, and their lack of continuous intent to return to the United States, could result in a finding that they abandoned their LPR status. In that case, it may be unreasonable to impute the parents' abandonment to the child since the child never left the United States. In such a case, then, that the child is unable legally to demonstrate his own intent as to his residence would be of no significance.

**[7]** This petition for review does not call on us to fully explore or firmly opine on the full extent to which imputation of abandonment of LPR status is reasonable, or on its possible limitations; we reserve this question for a later date. Under the BIA decisions and our own precedent, we hold that, because a child cannot legally form an intent as to domicile, the intent of the child's LPR parents as to whether they will return to live in the United States is imputed to the child (over whom the parents have custody and control) during the period of the child's unemancipation. At the point at which the child becomes an adult, however, he may legally demonstrate his intent separate from that of his parents.

## IV.

Under this legal framework, the intent of his parents governs Khoshfahm's status during the period of time before he turned 18. From the moment he reached 18, however, his own intent controls. *See generally Rangel-Zuazo v. Holder*, 633 F.3d 848, 851 (9th Cir. 2011) (establishing that 18 is the legal age of adulthood).

**[8]** Since the Khoshfahm family lived for six years in Iran before he returned to the United States, the BIA correctly concluded that their trip abroad was not "relatively short." *See Singh*, 113 F.3d at 1514 (concluding that the petitioner's trips abroad, "sometimes eight or nine months in consecutive duration," were not "relatively short"). Thus, we next consider whether substantial evidence supports the conclusion that the

---

This example simply illustrates the point that, although reasonable in this case, imputation of abandonment of LPR status from parent to child may not be appropriate in every circumstance. In reviewing BIA decisions, therefore, we must take care to uphold this doctrine only to the extent that its application is reasonable and consistent with "the sensible meaning of the [INA]." *See Mercado-Zazueta v. Holder*, 580 F.3d at 1104 (internal citation and quotation marks omitted).

government demonstrated by "clear, convincing, and unequivocal evidence" that Khoshfahm's parents lacked a "continuous, uninterrupted intention to return to the United States" during the period of time before Khoshfahm turned 18, or, alternatively, that Khoshfahm himself lacked such intent after becoming emancipated. *See id.* Only if substantial evidence supports the conclusion that the government sufficiently made one of these two showings can we uphold the BIA's conclusion that Khoshfahm abandoned his status.

We first consider whether Khoshfahm's parents abandoned their LPR status *before* Khoshfahm turned 18 such that their abandonment was imputed to him. In other words, we must evaluate whether substantial evidence supports the conclusion that the government met its burden of demonstrating by clear, unequivocal, and convincing evidence that Khoshfahm's parents lacked the intent to return to the United States, or abandoned their LPR status, before Khoshfahm became emancipated. If their abandonment did not occur until after Khoshfahm turned 18, then it cannot be imputed to Khoshfahm.

**[9]** The record before us compels the conclusion that the government did not meet its burden. Khoshfahm credibly testified that his parents always intended to return to the United States. He further testified that his parents were prevented from returning by the September 11th attacks and then by his father's heart condition. The record therefore demonstrates that, for a significant portion of their time in Iran, the event for which Khoshfahm's parents were waiting, and the point at which they intended to return to the United States, was the improvement of the father's condition such that his ability to fly was no longer restricted. During his hearing before the IJ, Khoshfahm (then 19) indicated that his father's condition had, by that time, improved, and that he had permission to fly but had not yet bought a ticket. The BIA expressly relied upon this fact to conclude that Khoshfahm's parents had abandoned their status. Assuming, then, that Khoshfahm's parents ini-

tially abandoned their status at the point when his father became able to fly but chose not to buy a ticket (as this suggests that the parents ceased to maintain their continuous and uninterrupted intent to return to the United States),[3] it remains unclear from the record *when* this change occurred.[4] In other words, the record contains no evidence of whether Khoshfahm's parents' abandonment occurred before or after Khoshfahm turned 18. It is the government's burden to demonstrate by clear, unequivocal, and convincing evidence that Khoshfahm's parents abandoned *during the legally relevant period of time*, that is, during the period of time when that abandonment must be imputed to Khoshfahm. Because the record does not contain *any* evidence of when the abandonment occurred (if it ever occurred), we find that substantial evidence does not support the conclusion that the government met its burden with respect to Khoshfahm's abandonment by imputation.

[10] Thus, we are left only to consider Khoshfahm's own actions as an adult. Khoshfahm credibly testified that he wanted to return to the United States during the entirety of his time in Iran. As soon as he reached 18, the age of adulthood, he immediately obtained the permanent passport that allowed him to travel alone. He then sought readmission to the United States just months after his 18th birthday. Thus, for the period of time during which the law recognizes his intent, Khoshfahm's actions clearly demonstrate his intent to return to live in the United States. In other words, there is no evidence whatsoever that Khoshfahm himself abandoned his LPR status. *Cf. Matter of Zamora*, 17 I. &. N. Dec. at 397 n.2 (noting

---

[3]As previously noted, Khoshfahm's parents did eventually buy tickets and return to the United States. As this fact was not apparently before the BIA, we do not rely upon it.

[4]To be clear, the father's failure to buy a ticket despite his ability to do so is critical because the record otherwise reflects that the parents maintained, during the period of Khoshfahm's unemancipation, a continuous intent to return to the United States.

that the petitioner did not seek to return to the United States until he was "well over the age of majority").

The record therefore compels the conclusion that the government failed to make the showing necessary to support a finding of abandonment. In light of this holding, we need not reach Khoshfahm's requests for asylum and withholding of removal.

## V.

We conclude that substantial evidence does not support the BIA's determination that Khoshfahm abandoned his LPR status. Therefore, he remains a Lawful Permanent Resident of the United States, and he is not removable.

**PETITION GRANTED.**

SMITH, N.R., Circuit Judge, concurring:

I write separately, because it is not necessary to speculate about potential exceptions to an imputation rule as the majority has done in section III.B of its opinion. There are no applicable exceptions to the rule in this case.

"[B]oth the BIA and this court repeatedly have held that a parent's status, intent, or state of mind is imputed to the parent's unemancipated minor child in many areas of immigration law, including asylum, grounds of inadmissibility, and legal residency status." *Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013, 1024 (9th Cir. 2005). This court has not specifically addressed imputing a parent's abandonment of LPR status to their unemancipated child. However, imputing parents' abandonment of LPR status to their children is consistent with our authority.[1] As this court set forth in *Saucedo-Arevalo v. Holder*:

---

[1]Although not addressing this abandonment, we have cited the BIA's precedent on imputation, *Matter of Huang*, 19 I. & N. Dec. 749 (BIA

"a parent's admission for permanent resident status is imputed to the parent's unemancipated minor children residing with the parent." [*Cuevas-Gaspar v. Gonzales*, 430 F.3d]at 1029; *see also Mercado-Zazueta v. Holder*, 580 F.3d 1102, 1103 (9th Cir. 2009) (holding that imputation applies for purposes of the five-year permanent residence requirement under 8 U.S.C. § 1229b(a)(1)); *Vang v. INS*, 146 F.3d 1114, 1116-17 (9th Cir. 1998) (holding that imputation applies for purposes of whether a minor has "firmly resettled" in another country); *Lepe-Guitron v. INS*, 16 F.3d 1021, 1024 (9th Cir. 1994) (holding that a parent's "lawful unrelinquished domicile" is imputed to "a child, [who] legally entered the United States with his parents, was always legally within the country, was domiciled here, but acquired permanent resident status, still as a minor, many years after his parents achieved it"); *Senica v. INS*, 16 F.3d 1013, 1016 (9th Cir. 1994) (holding that a parent's knowledge or state of mind concerning a fraudulent application is imputed to the parent's child with respect to grounds for inadmissibility).

636 F.3d 532, 533 (9th Cir. 2011). Given our court's precedent that (1) a parent's residency in the United States and (2) a parent's state of mind concerning a fraudulent application is imputed to a minor, it would be illogical to hold (under most circumstances) that the abandonment of LPR status would not be imputed.

The BIA has addressed this issue in at least three precedential opinions, *Huang*, *Zamora*, and *Winkens*, holding that par-

---

1988); *Matter of Zamora*, 17 I. & N. Dec. 395 (BIA 1980); and *Matter of Winkens*, 15 I. & N. Dec. 451 (BIA 1975), on several occasions. *See Cuevas-Gaspar*, 430 F.3d at 1025; *Mercado-Zazueta v. Holder*, 580 F.3d 1102, 1104-05 (9th Cir. 2009).

ents' abandonment of their LPR status is imputed to their children. These decisions are entitled to deference under *Chevron*. *See Marmolejo-Campos v. Holder*, 558 F.3d 903, 911 (9th Cir. 2009) ("[W]e apply *Chevron* deference regardless of whether the order under review is the precedential decision itself or a subsequent unpublished order that relies upon it."). Despite acknowledging these decisions and their binding effect, the majority appears to try and lessen the precedential value of these cases by suggesting that they should not necessarily be afforded deference, because the BIA cites to no authority to support their position. Specifically, the majority notes that the case of *Matter of Bauer*, 10 I. & N. Dec. 304 (BIA 1963) *overruled in part by Zamora*, 17 I. & N. Dec. at 397 (from which this line of authority was derived) does not stand for the proposition that a parent's intent is imputed to the minor child. However, the source of the BIA's holdings is not necessarily relevant under an analysis under *Chevron*. All three of these decisions are published opinions to which we defer as long as "the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. Inc v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). The BIA's answer is a reasonable construction of the statute. The imputing of a "parent's status, intent, or state of mind . . . to the parent's unemancipated minor child" has long been the standard in this circuit. *See Saucedo-Arevalo*, 636 F.3d at 533. I find no basis to diverge from this general rule in cases of abandonment. The majority conjures up possible exceptions and limitations (which have not been before the BIA) to suggest that the BIA's rule may not be reasonable in the future. However, our case does not present any such limitations. Under the circumstances presented here, I would accord the BIA's opinions in *Huang*, *Zamora*, and *Winkens* deference and hold that a parent's intent with respect to the abandonment of LPR status is imputed to a minor child during the period of his unemancipation.

However, because the issue before us turns on *when* Khoshfahm's parents intended to abandon their LPR status,

we need not speculate about potential exceptions and concerns raised by imputing a parent's abandonment of LPR status to his or her minor child.